## The Wabash, St. Louis and Pacific Railway Company

*v.*

## The People of the State of Illinois.

*Filed at Springfield January 29, 1883.*

1. Railroads—*unjust discrimination in freights on a through contract from points in this State to points in another State.* The court adheres to the conclusion reached in this case in 104 Ill. 476, holding section 87 of the Railroad act, to prevent unjust discriminations in the rates charged for carrying passengers or freights, to be free from any constitutional objection, and holding a railroad company liable to the penalty imposed by such section for discriminating in the rate of charges as to different contracts for through transportation of freight from points in this State to a point in another State, for different distances, charging a greater sum for the less distance of the entire carriage, than for the greater distance.

2. But this court disclaims the idea that the legislature of this State has authority to regulate commerce in any other State, holding, in the absence of anything showing to the contrary, that a single and entire contract to carry freight for a gross sum from a point in this State to a point in another State, necessarily implies that such sum is charged proportionally for the carriage on every part of the entire distance, and that charging a greater sum by a railroad company for freight to a point in another State, from a point in this State less distant than from another point in this State, is an unjust discrimination, prohibited by the statute, where it is not shown that such inequality in the charges is all for carriage entirely beyond the limits of this State.

Writ of Error to the Circuit Court of Ford county; the Hon. Owen T. Reeves, Judge, presiding.

Mr. H. S. Greene, and Mr. F. T. Hughes, for the plaintiff in error, made the following among various points of law:

That the section under which the action was brought is a regulation of inter-State commerce, which, under the constitution of the United States, Congress alone could make, and consequently is not within the legislative power of the State, see *Council Bluffs* v. *K. C., St. Jo. and C. B. R. R. Co.* 45 Iowa, 338; *Reading R. R. Co.* v. *Pennsylvania,* 15 Wall. 232; *Pennsylvania* v. *Wheeling Bridge Co.* 18 How. 421; *Henderson*

v. *Mayor of New York*, 92 U. S. 272; *Railroad Co.* v. *Maryland*, 21 Wall. 456; *Hall* v. *DeCuier*, 95 U. S. 485; *Railroad* v. *Hannen*, id. 465; *Telegraph Co.* v. *Texas*, 105 id. 460.

Mr. James McCartney, Attorney General, for the People:

The right to pass laws against extortion and unjust discrimination, is not given to the United States and prohibited to the States. The exercise of the power claimed here can not, in any way, interfere with or be controlled by the laws of other States through which the freight may be carried. It is only the charge we complain of, and not the carriage. The carriage may be through many States, but the charge only in one, and that must be contrary to the law of the State where made. The law has nothing to do with interState commerce.

That railroads are public highways, and subject to the police power of the State, see *Rogers* v. *Burlington,* 3 Wall. 654; *Sharpless* v. *Mayor of Philadelphia*, 21 Pa. St. 147; *Peoria and Rock Island Ry. Co.* v. *Coal Valley Mining Co.* 68 Ill. 489; *Marsh* v. *Fairbury, Pontiac and Northwestern R. R. Co.* 64 id. 414; *Prigg* v. *Pennsylvania*, 16 Pet. 539; *Railroad Co.* v. *Fuller*, 17 Wall. 560; *License Cases*, 5 How. 583; *Munn* v. *Illinois*, 94 U. S. 114.

Mr. A. Sample, also for the People:

The declaration shows that the unjust and discriminating charges were actually made in this State, which is admitted by the stipulation. The section of the act prohibiting unjust discriminations is merely declaratory of the common law. *Chicago, Burlington and Quincy R. R. Co.* v. *Parks*, 16 Ill. 460; *McDuffie* v. *Portland and Rochester R. R. Co.* 52 N. H. 430; *New England Express Co.* v. *Maine Central R. R. Co.* 57 Me. 188; *Massenger* v. *Pennsylvania R. R. Co.* 36 N. J. 407.

The statute is not one to regulate the rate of charges, but to prevent unjust discrimination and extortion. This is

within the police power of the State. *Railroad Co.* v. *Fuller*, 17 Wall. 560; *Munn* v. *Illinois*, 93 U. S. 113; *Peck* v. *Chicago R. R. Co.* id. 175.

The law does not attempt to regulate inter-State commerce, as it does not fix the rate of charges for transportation between the States. The charges having been made, and the service partly performed, in this State, makes the offence complete.

Per Curiam: We see no reason to depart from the conclusion reached in this case when it was here before. (See *People* v. *Wabash, St. Louis and Pacific Ry. Co.* 104 Ill. 476.) But to avoid misapprehension, we deem it advisable to state explicitly that we disclaim any idea that Illinois has authority to regulate commerce in any other State. We understand, and simply hold, that, in the absence of anything showing to the contrary, a single and entire contract to carry, for a gross sum, from Gilman, in this State, to the city of New York, implies, necessarily, that that sum is charged proportionally for the carriage on every part of that distance, and that a single and entire contract to carry, for a gross sum, from Peoria, in this State, to the city of New York, implies the same thing; and that therefore, when it is shown that there is charged for carriage upon the same line, less from Peoria to New York (the greater distance) than from Gilman to New York, (the less distance,) and nothing is shown to the effect that such inequality in charge is all for carriage entirely beyond the limits of this State, a *prima facie* case is made out of unjust discrimination, under our statute, occurring within this State. We hold that the excess in the charge for the less distance, presumably affects every part of the line of carriage between Gilman and the State line, proportionally with the balance of the line.

The judgment is affirmed.

*Judgment affirmed.*

Separate opinion by Mr. JUSTICE WALKER:

As this case is again before us for decision, I shall, owing to its vast importance and the disastrous and ruinous effects it must produce on our system of government if the claim of plaintiff in error should obtain, add something to what I before said.

If the doctrines contended for were allowed, it would be to release and entirely exempt all corporate bodies in the State from the governing or sovereign power of the State to prevent wrong and oppression of the people by such bodies. It would be to hold that the State, by creating and endowing railroads with the simple and necessary power to fix charges for carrying persons and property, had, through the legislature, without intending it, sold or surrendered the governing power of the State, and that such bodies are empowered to extort from the masses annually, for all time to come, sums greater than the revenues of the Federal government, beyond fair compensation for such carriage. If such bodies can not be controlled, to the same extent and under the same necessities for the general welfare, by the State, as natural persons, then the powers of government have been subverted and the States virtually destroyed, and they have become useless and expensive appendages to our governmental system. They would become powerless to perform the functions and answer the great and all-controlling purpose of organizing government, which is to secure protection. It would undeniably be to recognize and declare such bodies above and beyond legal control, — to create government agencies and instruments greater than the sovereign State, and not amenable to its governing power. Present the question as we may, whether as exempting them from such control under the fiction that the granting of the charter of plaintiff in error was a contract never to control it in its charges and never to control its power to wrong and oppress the people, and that it is protected by the obligation clause of the constitution, or that the

regulation of such charges and the prevention of extortion and unjust discrimination are regulations of commerce among the States, and are prohibited under either claim, the power of the States to protect the people from such oppression would be destroyed, and the States themselves would be destroyed. To admit either proposition must inevitably lead to this result. This, then, is the naked question to be determined.

The provision of our constitution requiring the enactment of the statute under consideration was deliberately framed, and, on full consideration, was ratified by the people. It was considered by both the convention and the people to be imperatively demanded in the promotion of the general welfare, and to afford the people protection, and security from the invasion of rights the State government was created to protect.

As we seem to forget, or are drifting away from, the great, plain and never denied underlying principles of our government, I may be excused in referring to some of the axiomatic principles that have been supposed to be self-evident,— especially so when we are asked to disregard the plainest doctrines of our government. I shall define a State to be the whole people embraced in a prescribed territory, united into one body politic, for the purpose of mutual protection, and security from wrong and violence from within and from without its borders. A constitution, or foundation of government, embraces and declares the principles, regulates the division and exercise of the governing power, directs to what officers or agencies it shall be confided, and limits and controls its exercise,—in other words, it establishes the government, delegates, limits and defines the manner in which the governing power of the State shall be exercised, and by overpowering necessity compels those who frame government to confer ample power on its agencies to enforce the protection and security for which government is instituted. And the same necessity imperatively demands that the power thus

conferred shall be forever held and exercised for the purposes for which it was delegated to the agencies of the government. It is self-evident that this power must not only be preserved and exercised for the purposes for which it was delegated, but it must be defended so long as the government shall exist. Nor can the powers thus conferred be exercised for any other than the purposes for which they were delegated.

It is axiomatic that in all representative governments the sovereign or governing power belongs to and resides in the people, as the source of all power,—that this power is inherent, inalienable and indestructible, without the subversion or destruction of the government. This is absolutely true, from its inherent nature and the purposes of such government. To surrender or sell such power to its full extent, is to destroy such government. To impair or diminish the sovereign or governing power, is to weaken the power to govern the people and to protect them in their rights, and to that extent defeats the purpose for which government was created and is maintained. The founders of our government conferred such power only as was deemed necessary to answer the purposes of its organization, and to be perpetually held, unless withdrawn by the people when exercising sovereign power.

When the State government was organized, the people of the State delegated governmental powers to the officers created by the organic law, to be held and exercised alone for governmental purposes. It was but a delegation of a trust, and not the title to the power. Officers or governmental agencies take no title to the power, but simply the authority to exercise it for the purposes of government. Had the framers of our State governments imagined that it would ever be claimed that such agencies had the power to sell, surrender, impair or diminish the power thus held in trust, they would have prohibited such action in terms that none would have misunderstood; but it was so generally and unquestionably understood that governmental officers held

16—105 Ill.

nothing more than the power in trust for governmental purposes, that it would have been regarded as an insult to the intelligence of the people to have inserted a provision in the fundamental law prohibiting the sale or surrender, the impairment or diminution, of the sovereign or governing power of the State. All persons having the slightest knowledge of the powers and purposes of government have always believed, and still suppose, that the power of sale or surrender can not exist, and all persons of intelligence would be profoundly astonished to learn that a proposition so ruinous, so destructive of government, so oppressive to the people, and so violative of every principle of government, had been announced by any court. To hold that such power may be trafficked away and squandered, is to suppose that those who framed the State governments were wholly incompetent to the task, and were ignorant of the plainest principles of government. It is monstrous to suppose they, when framing a government designed to be perpetual in duration, and which they intended to arm, and supposed they had armed, with ample power to secure the best of governments, did in fact empower the agencies to sell this power and destroy the government they were engaged in organizing. To hold that such was their purpose, is to impute to them the weakest and most puerile purposes. It is to hold that those who framed the State governments were engaged in the idle ceremony of framing a government, and at the same time, and by the same instrument, empowering the officers created to enforce its provisions, to destroy and terminate its existence, by the sale of the sovereign powers. No more monstrous constitutional heresy could be invented. It is impossible to attribute such purposes to those men. It would be to deny them ordinary intelligence.

There is no language or provision of our constitution that can be tortured into power to sell immunity from governmental control, to either natural or artificial persons, and to

hold there is such power, violates every known rule of interpretation and construction. It is opposed to every principle of government, is destructive of government itself, and is to exempt a portion of the community, and leave them unrestrained, above and beyond governmental control. It would be subversive of government, order and security. This is not the age, nor is this the country, in which to try the perilous experiment of creating highly privileged classes, above and beyond the control of government, to prey upon and oppress the people, not only without, but contrary to all constitutional authority. To sell such immunities is contrary to every principle of justice, policy, and equality of right. It violates every principle of right and of our government, and in this case violates an express provision of the constitution.

Were the State to sell to a natural person exemption from governmental control, is there in this broad land a right thinking man that would not denounce it as a monstrous act of wrong, and a flagrant violation of the fundamental law, however specific the terms of the contract, and however ample the consideration? I apprehend no one could be found so dull as not to see the monstrous violation of every principle upon which our government is founded. And if it would be unjust, and in violation of all principle, to sell such an immunity to a natural person, in the name of reason, justice and equality can such a privilege be sanctified and become just, fair and constitutional when extended to a corporation,—a mere instrument and creature of government? A natural person is an integral part of the body of persons holding, and at will exercising, the sovereign power of the State, and is entitled to as high consideration as a mere creature and instrument of government. It must then follow, that if the natural person can not be thus exempted, a corporate body can not, as the mere instrument brought into being by and to serve the sovereign power can not be greater, or its rights more sacred, than an integral part of the sover-

eign power.    It irresistibly and logically follows that the legislature is absolutely destitute of all power to exempt persons, natural or artificial, from governmental control.

It would require no argument to prove that a contract entered into by the chief executive of a State with one of its inhabitants never to enforce the laws of the State against him, would be corrupt, and would forfeit his right to office. So of a judge, were he to enter into a contract never to render judgment or sentence against a person.    In such cases all persons would intuitively know that such contracts constituted a crime so black as to cover such officers with infamy and detestation so long as their names were remembered. Then, if to sell or surrender the executive or judicial power is so infamous, how can the courts hold that a bargain between the legislature and a corporation that the latter should never be controlled, but might wrong, oppress and extort from the people without limit or control, be held pure and free from the taint of corruption, and must be protected under the obligation clause?    I can never believe, until it shall be so decided, that any court will ever hold that what is crime when committed by either of two branches of government, is pure, just and right when committed by the other.    It would be monstrous inconsistency for a court to hold an act perpetrated by one branch of government is corrupt, base and criminal, but when perpetrated by another is honest, just and legal.    And the sale or surrender of governmental power by either branch is precisely the same, in principle and effect.    No person can make even a plausible distinction..  Neither is there a particle more constitutional authority for the sale or surrender of such power by the legislature, than by the Governor or a judge.    But the journals of the legislative bodies of this country may be searched in vain to find a single instance where such an exemption has been made, or even been proposed.    Other unauthorized and unwarranted exemptions may have been made, but the mon-

strous and unheard of exemption from governmental control has never been granted or attempted, and it is impossible to believe it ever will, so long as the principles upon which our government is based are respected,—that any legislative body will be found so reckless of duty as to make such a grant or exemption. It is too monstrous for intelligent belief. Nor can the courts, by mere inference, justly hold that such a purpose ever actuated such bodies, in the absence of express language declaring the purpose.

Again, an attempt by force to deprive the State of governmental power is denounced as treason, and punished by the highest penalty that can be inflicted. It is the most infamous and detestable of all crimes, and is execrated by all respectable and patriotic persons. Were the legislature to sell or surrender the powers of government, it would destroy the government as effectually as it can be done by treason, and to part permanently with a portion of the governmental power accomplishes, in part, the purposes of treason. It is a partial destruction of government. Then, is it possible for a court to imply a contract for an exemption from governmental control, and sustain such a contract steeped in such turpitude? Is it possible to say such a contract, violative of every principle of government, and such as, if entered into by either of the other branches of government, would be denounced and execrated as the most infamous corruption, must be protected by the obligation clause? It would seem to be impossible to maintain such a proposition, or even contend for its establishment. Were the legislature to attempt such a betrayal of so sacred a trust, it would be denounced as infamous treachery.

From our nature and environments, government is a supreme necessity, and never a choice. It is imperatively demanded, and is indispensable to the protection of life, property, and such liberty as the government accords to the governed. All persons hold their rights subject to the neces-

sities of the general public. Those are the terms upon which all hold their rights to protection. It is forcibly expressed by the maxim, "*salus populi est suprema lex.*" Government must be armed with all necessary power to protect the governed, nor can that, the great primary object of all governments, be defeated, except by overpowering force. Neither can the legislature confer power or exemptions on natural or artificial persons that will defeat the great purpose of the organization of government. It is the inherent and inalienable right of all persons in our government to equal protection from wrong, injustice and oppression, and so long as they are worthy of citizenship the people will maintain that right, in one mode or another. They may be deprived of the right for a time, but never permanently. The people will never sanction a doctrine so unjust, so unequal, and so monstrous, that the legislature may sell exemptions from governmental restraint, whether to natural or artificial persons.

We may search the charter in vain to find anything that exempts the company from the restraining power of the State, in the interest of good government. It is true that the government created it a common carrier, and empowered it to charge for services as such carrier. It thereby became endowed with the attribute or faculty to contract in reference to its business. A natural person is born with the same faculty, but he has in all governments been controlled, limited and restricted in its exercise by the law-making power from the dawn of history, and probably before. Although the power of natural persons to contract is conferred in its amplest form by nature, government has ever exercised the power to limit and restrain, or even prohibit, its exercise, for the general welfare. Government, in all ages and among all peoples, has prohibited all persons from contracting until they arrive at a specified age. It has, notwithstanding all persons are endowed with the faculty of contracting, in all governments where our language prevails, absolutely prohibited married women from

contracting.   All persons are endowed by nature with power
to contract for any rate of interest they choose, and yet, in
most civilized and christian governments, the right has been
limited to a maximum rate.   Men have been deprived of
their inherent right to contract for more than the prices fixed
by law for food, for drayage, hack hire, for tolls on roads,
bridges and ferries.   They have been prohibited from the
purchase of lands because of alienage, and citizens have been
prohibited from its purchase by verbal contract; and it has
been provided that the title shall not pass unless conveyed in
writing in a prescribed form, and the title thus transferred
may be defeated unless the deed be recorded in a specified
manner or a prescribed time.   And the right of natural per-
sons to contract has been prohibited when the subject of the
contract is declared immoral, criminal, or contrary to public
policy, and the legislatures of all the States have exercised
the power to control the right, by requiring all persons to
procure and pay for licenses to pursue almost every kind of
business; and the power of the legislature to control the
exercise of this natural right to contract has never been
questioned by any court.   It has been conceded to be the
exercise of just legislative power.   Then, on what principle
or for what reason shall we exempt corporate bodies from the
like legislative control?   It is neither required nor author-
ized, but it is expressly prohibited by the constitution in this
class of cases.   It was not intended by the General Assembly
when it granted the charter for the organization of this com-
pany.   Those named in the charter to organize the body did
not suppose that such an immunity was granted, nor did the
officers of the company, after it was organized, suspect they
had made such a contract with the State.   If a contract was
made, none of the parties to or connected with it ever intended
to enter into such a contract.   If there was such a contract,
it was made in despite of all language necessary to a contract,
against the intention of the parties, and in defiance of every

rule of the law.  Can any sane man believe that any legislature ever organized in the Union was so reckless of its duty and of the powers of government as to have granted a single charter, had it supposed on the organization of the company it would not be amenable to the power of government, to the same extent, and for the same reasons and purposes, that natural persons may be governed and controlled?  It is impossible to believe such a legislative body ever existed, or ever will.  The establishment of government creates absolute power unless restrained by constitutional limitation, and unless so limited it remains absolute.

Government existed before corporations were organized.  They were created as governmental agencies or instruments, to aid in the accomplishment of the purposes for which government was organized.  They are employed as governmental instruments to carry out enterprises which government is not adapted to accomplish.  They combine the capital, energy and prudence of individuals, with the prospect of individual gain in the furtherance of the public interest and general welfare.  Corporations are never created simply for private gain.  Their nature is, inherently, a monopoly, combining capital and power detrimental to private enterprise, and when they become injurious to, or cease to promote, the public interest, they must be controlled or extinguished.  They must never become to the States what the ancient barons were to the British government,—not only uncontrollable by, but more powerful than the government, levying tribute upon all who came within their power,—unless we are prepared to surrender our liberties.

Charters to corporations are granted upon a consideration rendered or to be rendered; and that consideration is, that they will assist, within the scope of their power and within the purposes of their organization, to accomplish the purposes for which government was organized.  When they cease to answer that purpose the consideration fails, and when they become

instruments of oppression they must and will be controlled. If they shall be uncontrolled, we must expect to see their power and oppression increase to destructive lengths. The history of the East India Company illustrates the growth and abuse of irresponsible corporate power. From a small beginning it grew to be an instrument of oppression never surpassed in the world's history. All uncontrolled power is sure to be abused, and it increases with great rapidity, as illustrated by the East India Company, and the abbeys of England. Wholesome restraint is absolutely indispensable, or the people must be oppressed to the extent of the power of extortion possessed by these bodies,—and the extent of the oppression is commensurate with their power.

It is an axiomatic principle in our government, that the people, even when acting in their sovereign capacity, or the General Assembly exercising a mere trust, or both combined, are wholly incapable of selling or surrendering the governing power of the State to persons, natural or artificial. The State has no more power to sell its sovereignty and produce its own destruction, than has a natural person to sell his existence. Nor is government more capable of selling, surrendering or permanently abdicating powers necessary to perform its functions, than has a natural person to sell or surrender his members or the faculties necessary to preserve his existence. It is monstrous, ruinous and destructive to government to hold that sovereign power may be sold, surrendered, impaired or diminished, by deed, by contract, by statute, or in any conceivable mode, and to do so would violate the plainest principles of government. Take away the powers necessary to government, whether they be direct or incidental, and sovereignty is destroyed to the extent it is diminished, because the power to preserve its existence and perform its functions is destroyed. The great and essential attribute of sovereignty is to preserve its existence, and the power to perform the functions for which it was called into

action.   All know that without sovereign power there can be no government.  When they are all surrendered, government ceases; and when impaired or diminished, the efficiency of government is impaired, and the power to protect the governed is destroyed in part, and the government fails in the purpose of its creation.   It is, then, a monstrous constitutional heresy to hold that by merely conferring the power on this body to charge for services rendered in the course of its business, the State surrendered the power to control such charges, to the same extent and for the same reasons and purposes that it may control similar rights or powers of natural persons.   It was indispensable to the transaction of the business, and to accomplish the purposes of the organization, that this franchise or power should be conferred, as without it the body would have been powerless to make and enforce charges for any kind of service.   It is, therefore, impossible to infer, from this grant of power, any intention on the part of the legislature to surrender its governing power over this body.   But had it been expressly agreed, in the most formal terms, by the charter, that the State surrendered and agreed never to exercise the governing power, it would have been absolutely void, because it is a sovereign power, and is incapable of sale or surrender.

It follows, from what has been said, that no well founded claim can be urged for immunity from governmental control simply from the grant of the charter and the power to fix charges for carrying persons and property over its road. Such a claim is condemned by the considerations here submitted.   We held in the case of *Wiggins Ferry Co.* v. *People*, 102 Ill. 560, that a corporation created by legislative charter is subject to the same controlling power of the State as are natural persons.   That case is conclusive of this question of the power to control this corporation, and to prevent it from making unjust discriminations in this State.

But it is urged that the constitutional provision requiring this enactment is prohibited by the third clause of section 8 of article 1 of the Federal constitution, and for that reason the statute is void,—that it is an attempt to regulate commerce between the States, and that power is possessed alone by Congress. Even if the charges of draymen, warehousemen for storing produce and merchandize, and railroads for carrying such property to market, could be raised to the dignity of commerce, in any sense or for any purpose, it is impossible to see how the regulation and prevention of unjust discriminations in this State, under this law, can be held a regulation of commerce among the States. It is purely and simply the exercise of the great police or governing power of the State, within the State, over its inhabitants, for and in the interest of good government. The law does not purport, nor can it be held, to affect property being transported through the State. It does not impose a tax or duty upon such property, nor does it prevent or regulate the carrying of such property through the State. It leaves such transportation perfectly free and unrestrained. Nor does it impose an export duty, tonnage rate, or any increased charge, on property being carried beyond the line of the State, nor any duty or charge on property brought into or passing through the State. It does not, nor can it be tortured into the slightest, attempt to regulate or affect the charges that shall be made by other roads or carriers after the property passes the boundaries of this State. It does not, nor can it by any possible means, affect the price of the commodities thus carried when they reach the market, whether in the State or abroad. Whether charges of the carrier shall be exorbitant or reasonable, can not affect the price of the commodity one penny when it reaches the New York market. It affects, and can only affect, the producer, manufacturer and shipper, and the carrier at the point of shipment; and that is purely local, and is all within this State.

How is it possible to say that the commerce of the States is affected, when there is neither an export nor import duty or charge imposed on the commodity, or the roads or people of Indiana, Ohio or New York are not affected one jot or tittle, or the price of the article in New York, or the ultimate or intermediate market, is not affected to the extent of one cent? It would seem to be impossible to even imagine that the law, in the remotest degree, tends to interfere with or regulate commerce among the States. To so hold is to pervert language, or disregard the relation of things, or misapply or pervert principles. The only possible effect that is or can be produced, is upon the producer, manufacturer or owner of the property, and the carrier, by exorbitant charges, or unjust discriminations in charges. When they are exacted, it reduces the price of the commodity in the hands of the producer or shipper, and increases the receipts of the carrier. The purchaser deducts the price for transportation from its value in the market to which he ships, and enough more to pay him a profit, when he purchases from the owner. Thus it is, the owner or shipper is affected injuriously, and the carrier reaps the profit. If the producer or manufacturer ships his own products to the market, the amount of the unjust extortion is deducted from the price he receives, and to that extent the gains of the carrier are unjustly increased. But by no kind of reasoning is it possible to say that any other person's interests are affected, from the time the article is shipped until it reaches the ultimate market, and not then. It then conclusively follows, if, after the commodity leaves this State, the interests of no other person or corporate body are affected in the slightest degree, it is impossible to hold that commerce is affected by this law beyond the boundary of the State, or that it, in the remotest degree, affects or regulates commerce among the States.

It would therefore seem impossible, by any process of reasoning or by any rule of construction, to hold that this law,

in any sense or in any degree, regulates commerce among the States. The manifest purpose of that clause was to prevent impositions, burthens and obstructions on articles of commerce passing from one State to another, or such articles passing through States. It was intended that such commerce should, so far as State action should be concerned, be free and unobstructed. Can any person conjecture any other purpose for the insertion of that provision? And this statute leaves commerce as perfectly free and unobstructed between this and other States as was designed by the framers of the Federal constitution. Congress has made no attempt, nor has it the power, to regulate or control the internal affairs or police of the State. The unjust discrimination and extortion were made in the State. The transportation was in the State, and is it possible, without an utter disregard of language, to hold that such a law is prohibited by that clause of the constitution? To so hold is to import terms or provisions into that instrument that were not placed there by its framers. It would be to amend and enlarge the clause to embrace purely State police power, and to control legislative action, and prevent just government and necessary protection to the people.

It is impossible to perceive how this provision has any more controlling effect in this case than the power of the executive to convene Congress in a case of emergency. When the State shall attempt to control commerce between itself and other States, it will be time to invoke this provision. But even then it may be gravely doubted whether the mere charges a common carrier may make for transporting property between or through the States can be raised to the dignity of commerce. The mere change of names never changes the nature or property of things. To call the compensation of the common carrier commerce, if it is not, it remains the same, and is simply compensation. Has any one ever supposed that the wages paid to laborers, mechanics,

artizans, draymen or hackmen constitute commerce, or any part of it? Yet they all contribute to its support. A large portion of the commodities entering into and swelling the commerce of the country, passes through the hands of and is transported by draymen; and shall it be said the legislature has no power to regulate their charges, because it is prohibited by that clause of the constitution,—that the drayman is engaged in commerce, and is a link in the great chain of instruments necessary to its support? If prohibited by that clause, it has been generally and uniformly violated by the legislature of every State in the Union since its adoption, without its being suspected. Each of these occupations depends on precisely the same principle. It is impossible to make any well recognized distinction. The one transports vastly more, and in a different manner from the other; but small sums, and operations of precisely the same character, must be governed by the same rules as larger ones.

But if it were conceded that Congress has power, under that clause, to regulate such charges, it has never acted. And shall the people be deprived of protection because the State can not and Congress will not act, and without usurpation the courts are unable to afford relief? Must the people remain unprotected? In such case, can it be doubted that the legislature may act until the Federal power shall be exerted? The reports of the Federal Supreme Court abound in adjudged cases announcing that it may, and it must be so from inevitable necessity. The people must have protection against injustice and wrong; and it must be, from the very nature of our dual system of government, that the legislatures of the States in such cases may afford protection until Congress shall take action,—and the absolute necessity for protection vindicates the wisdom of the doctrine.

The same objection was interposed to the Railroad and Warehouse law, in the case of *Munn* v. *Illinois*, 94 U. S. 113, but after a most thorough and exhaustive consideration of

all the principles involved, the Supreme Court vindicated the law, and placed its validity on impregnable grounds by unanswerable reasoning, and decided the principle of the power of the State government to regulate its internal police, by the most cogent and unanswerable reasoning. In fact, it has demonstrated the power and wisdom of such controlling power by the legislatures of the States. In that case the principle was more expanded than is required in this case. There it was urged, that there was an interference with commerce between the States, because the legislature fixed the maximum charges for handling and storing grain in warehouses in Chicago, that formed an intermediate link between eastern and western transportation companies, through which grain from Iowa, Nebraska, portions of Wisconsin and of this State, was compelled to pass, and be reshipped on connecting lines, to the east. Yet that court justly and wisely held the law in nowise regulated or attempted to regulate commerce among the States.

It is impossible to conceive how any well defined distinction can be made between that and this case. The principles involved are precisely the same. The doctrines of that case may be ignored, but they can not have force, and hold that the law in this case is prohibited by that clause of the constitution. It would be impossible to reconcile two such decisions, without a resort to refinement, impalpable distinction and unmeaning exceptions. If this law is held unconstitutional, the doctrines of that case must be disregarded or overruled; and from the force of the reasoning, the clearness of the statement of its doctrines, and the justice and wisdom of its principles, I believe they will never be overruled or modified. Their wisdom shows a thorough comprehension of the great underlying principles of our dual system of government, and to preserve its existence as formed by its founders they must be maintained in their full integrity.

The case of *Carton* v. *Illinois Central R. R. Co.* 59 Iowa, 148, is referred to as announcing a different doctrine. Counsel for defendant in error insists there are well founded distinctions between that and this case. Be that as it may, I shall not stop to inquire. Whilst I have high respect for the learning and ability of that court, I am unable to change my views as embodied in the opinions previously filed in this case. I am not convinced by its reasoning, and I believe that great, fundamental and controlling principles were overlooked in its decision.

It is also urged that *Telegraph Company* v. *Texas*, 105 U. S. 460, is opposed to the validity of this law. In that case the facts were different, and the principles involved are unlike this case. But there is no language to indicate that the court designed, in the slightest degree, to impair the doctrines of *Munn* v. *Illinois, supra*. Nor can I ever believe that so well considered a case will be overruled, or its doctrines impaired, until the court shall indicate the purpose by language, or by deciding differently in a case similar in all its facts and principles. The whole question is one of power of the State to regulate its internal police, and to afford protection and good government to its people,—to exercise the powers that were retained when the Union was formed, and to carry out the purposes for which the State governments were organized and are supported by the people. When people are aggregated into society, they must and will have protection, and that can only be afforded by government. This necessity lies back of and beyond all human government, and will be asserted by the people.

I assume, as an incontrovertible proposition, that the people, when acting in their sovereign capacity, may perform every governmental function within its territorial limits, and as equally incontrovertible that the people, when so acting, may empower or require the legislature to perform and exercise all governmental power, unless prohibited by the Federal

constitution.    The tenth amendatory article of that instrument expressly reserves all powers not delegated to the Federal government or prohibited by that instrument, to the States, or the people, respectively.    The States have not been deprived of this power, and they may exercise it without limitation or control.    There can be no question that the State has the power to regulate commerce confined alone to the limits of the State; and if this regulation was intended to and does only operate on the roads in the State, and the carrying of freights within its limits, that is the end of this controversy.    The provision of our constitution relating to the enactment under consideration, requires the law to prevent unjust discriminations and extortions for the carrying of persons and property on the roads in this State.    The statute in terms professes only to regulate the roads in this State.    The constitutional provision and the statute were adopted to afford the people protection, and they have a right to have them enforced in their just and reasonable spirit.    Is it possible that under the name of commerce these vast bodies shall be permitted to oppress and extort from the people without control, or any limit but the amount they can extort from the people?    Are the States to be shorn of the powers they undeniably possess, and which have been guaranteed to them by the Federal constitution, because it may operate to deprive these corporations of the unlimited and uncontrolled power to unjustly discriminate and extort in their charges for transporting persons and property over their roads?    Must the people be oppressed and impoverished by unjust exactions by uncontrolled monopolies, because it may reduce the profits of these bodies in carrying the products of the farm and the manufactory to market,—and all in the name of commerce?    Can any government lend itself to such ruinous oppression of its people, and justify such injustice and oppression under the claim that it is promoting and advancing commerce?    Are the great body of the people, who produce and sustain

17—105 Ill.

commerce and these mighty corporate bodies, to be forgotten in this race for gain by the speculator and these corporate bodies? Are the producers to be left without protection, and at the mercy of those who may oppress them without restraint, because, it is said, to afford them protection will cripple or interfere with commerce? Justice, right, and the great and primary purposes of founding government, would say not. It surely has not yet reached the point that commerce must be supported by oppressing the great body of the people,—by sanctioning and protecting oppression, injustice and extortion. Shall these bodies be permitted to extort from the producer half the value of his property for conveying it to the nearest or any other market? And shall it be said that the great fundamental principles of our government protect such flagrant injustice, and prohibit the State from protecting the citizen from such monstrous oppression?

It may be said this was not such a charge, nor do these bodies intend ever to make such charges. I concede those now controlling these bodies have no such intention, but they are powerless to control those who shall succeed them. Human experience teaches that uncontrolled power is only limited by the interest that controls its exercise. One of the great purposes and necessities in the organization of government is, to regulate and control the prices to be charged for property and labor to just and reasonable limits. Every natural person is compelled to submit to such legal restraint, and why not artificial persons? They are surely no more sacred than natural persons, nor are their rights entitled to more respect or greater protection. Their right to contract is subject to the same limitation and control as that of natural persons. Government has the power, and has always exerted it, to control man's natural right to contract, and all of the governed must submit to the exercise of the power, whether they be natural or artificial persons. To leave these bodies unrestrained would be destructive to the producing classes,

whose interests and rights seem to be wholly disregarded in the struggle for exemption from governmental control. In this fierce contest the interests of the trader and these bodies seem to be alone considered, whilst the producing class, upon which the other two are wholly dependent for their existence, seems to be wholly ignored,—or if not, it seems to be regarded as lawful prey for the others.

· Shall these bodies be permitted to charge one person extortionate rates, and carry for nominal rates for another? Shall they be permitted to become the arbiters of the growth and prosperity of one town or community, and of the destruction of others? Shall they, at will, build up one community, enhance the value of its property by low rates of transportation, and depreciate property, diminish business and impoverish the people in another by oppressive rates? Or shall they, by combination, be permitted to fix rates that render the producers their serfs? Shall they be permitted to fix rates so low in favor of the opulent manufacturer, and so high on the products of his more humble rival, as to drive him from the field of competition? Shall they be permitted to fix rates so exorbitantly high as to receive more for carrying products of the farm and factory than the cost of production? Shall they be permitted, by combination, to compel one portion of the people of the Union to labor without profit for the aggrandizement and opulence of another portion? Or shall they be permitted to compel all classes to labor for the aggrandizement and increase of wealth of these bodies? It may be these abuses have not occurred, but if not prevented they surely will, whenever the interest of these bodies shall prompt such action.

Can it be possible that this or any other road of the State may make arrangements with roads out of the State to carry persons or property at given rates over their roads, and then charge double or treble that sum for through transportation when the person or property has passed over but a few miles

of road in this State, and thus evade the law? Suppose, under such an arrangement, three-fourths of the price for freight from a point near the eastern line of this State to New York were imposed for carrying it over the few miles in this State, would it not be monstrous injustice? And shall it be said that the contract to carry is entire, and precludes all inquiry into the extortion, and the constitutional and statutory provisions be defeated, and the people left unprotected from such monstrous oppression? Shall all reduction on freights from our State to the eastern markets thus inure alone to our railroads, and not to our farmers and producers?

In this case, plaintiff in error fixed the through rates in both cases. We have, therefore, the right to infer that it had full authority, and that the rates beyond the State line were the same in both cases. If they were not, the fact would have been proved, and thus shown that the rates were the same in this State, and a recovery defeated. If the rates were the same in both cases beyond the limits of the State, it conclusively establishes that the unjust discrimination was made in this State, on the road of and by plaintiff in error. Of this there would seem to be no question; and if so, then the corporation has violated the law, and is liable to the penalty.

The statute contains a most salutary provision, imperatively demanded for good government and for the protection of the people against present and future injustice and oppression. Shall the courts, by strained and unauthorized constructions, and, I may say, against all rules of construction, license these already powerful bodies to oppress the people, and defeat the purposes compelling the formation of government? To leave them uncontrolled is to create an *imperium in imperio*, that would inevitably lead to strife and conflict. The people have the inalienable right to protection against wrong and oppression, and there is no power known to our system of government that can render mere artificial persons,

created as instruments to promote the purposes of government, independent of the government, or that can license them to oppress the people.   Such a proposition is too monstrous to be entertained.   It would be opposed to every principle of government, reason and justice.   Shall we then, on mere shallow pretexts, defeat the constitution and the statute, both adopted within the scope of undoubted power?   Most assuredly not.

Is it possible to hold that an entire contract, based on unjust discrimination and extortion, is too sacred to be examined, and its true character exposed and its iniquity punished? Government is not so impotent as not to be able to detect and prevent oppression under any guise it may assume.   Courts surely will not defeat a statutory provision so imperatively demanded for the protection of the people from present or future injustice and oppression.   It is not the function of the court to construe the constitution in the interest of oppression and for its promotion, and to cripple, diminish and suppress liberty, justice and right.   There are and can be no persons, classes or governmental instruments above and beyond the governing power of the State, under our form of government, nor has Congress, or any of the Federal functionaries, power to create such classes.   Nor does Congress have a particle of constitutional power to interfere or intermeddle with the internal affairs or police power of the States.   It would be bald usurpation for it to attempt to fix the rights or control the acts or relations and duties of the people to the State or to each other, or to attempt to fix such relations between corporate bodies and the State or people.   Nor can any other branch of the Federal government accomplish such results without usurping power.

In any view I am able to take of this case I can not perceive that there has been the exercise of the slightest excess of power in the adoption of the provision of the constitution or the statute under which this proceeding was instituted.

To hold that power was exceeded, would lead to the most ruinous, if not destructive, results. It would deprive the States of their just governmental powers, guaranteed to them by the Federal constitution. It would prevent them from affording the protection for which the State governments were organized. It would leave the people at the mercy, alone, of great, powerful and grasping corporate bodies, above and beyond the power of governmental control. It would strike down and render necessary governmental control impossible. It would be to license these bodies to oppress the people; to build up some places and communities, and destroy others; to render some persons opulent, and crush and destroy others, without any power to control their acts or stay the hand of oppression.

That these bodies have conferred great benefits in developing the resources and increasing the growth of the country, none will or can deny; yet in time this would have all been accomplished by slower processes. They were created and brought into being by the State to accomplish these very purposes. But we should never forget that all changes, however beneficial they are supposed to be, are almost invariably attended or followed by their compensating evils, and the introduction of corporate bodies as governmental agencies will scarcely prove an exception to the rule. Their introduction as instruments of government in effect engrafted on our republican institutions the aristocratic and antagonistic privileged class of other governments, the results of which no one is able to foresee or predict; but unless duly guarded it must produce vast, and it may be ruinous, changes in our governmental system and social relations. It is, no doubt, the introduction of a mighty force, that will produce great and important changes in our institutions and our civilization. Already corporations, and their misgovernment, have enabled poor men in a few years to accumulate vast fortunes, counted by many millions of dollars, thus producing an unhealthy

distribution of the resources and wealth of the country,—depriving the many of all means of competing with the opulent few. It increases poverty, and, as a result, ignorance, vice and crime are increased, and the body politic is injured. This wonderful accumulation of fortune could never have been accomplished under just statutes, fairly interpreted, and had these bodies been properly managed and governed by their directors. No system or policy of government can ever be promotive of the general welfare and happiness of the people, which compels the great body of the people, whether by force or by unjust legislation, to labor for or contribute the fruits of their toil unjustly to a privileged few. Laws should be fair in their enactment, and just in their interpretation. This is the great controlling purpose of the organization of government.

But concede all that is or can be claimed for these bodies, still that does not require or authorize the courts to hold that they must, for that reason, be exempted from the governing power of the State. If that must be conceded for these advantages, then we have paid a fearful and disastrous price,—no less than the destruction of the great primordial principle of protection of all in the enjoyment of their rights,—the principle from which all other governmental principles emanate, and upon which they depend and by which they are controlled. It is the very essence and soul of our system of government. Destroy it, or the power of its enforcement, and government is destroyed and subverted, and it, with all its instrumentalities, becomes a mere instrument in the hands of the few to oppress and tyrannize over the people in carrying out their unhallowed schemes of gain or power. No one can or will more readily or cheerfully render assent than myself to the proposition that corporate bodies are entitled to the same rights, and measure of protection in their enjoyment, when assailed from any source, as are extended to natural persons; but as I understand the law, neither such bodies

nor natural persons can be exempted from governmental control, nor can the one more than the other enjoy such exemptions.

These are but some of the most obvious reasons that lie on the surface of this case, and other cogent reasons might be urged if time and space would permit.

I, for these reasons, hold that the judgment of the circuit court is properly affirmed.