## WABASH, ST. LOUIS AND PACIFIC RAILWAY COMPANY *v.* ILLINOIS.

ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

Argued April 14, 15, 1886.—Decided October 25, 1886.

A statute of Illinois enacts that, if any railroad company shall, within that State, charge or receive for transporting passengers or freight of the same class, the same or a greater sum for any distance than it does for a longer distance, it shall be liable to a penalty for unjust discrimination. The defendant in this case made such discrimination in regard to goods transported over the same road or roads, from Peoria, in Illinois, and from Gilman, in Illinois, to New York; charging more for the same class of goods carried from Gilman than from Peoria, the former being eighty-six miles nearer to New York than the latter, this difference being in the length of the line within the State of Illinois. *Held*:

(1.) This court follows the Supreme Court of Illinois in holding that the statute of Illinois must be construed to include a transportation of goods under one contract and by one voyage from the interior of the State of Illinois to New York.

(2.) This court holds further that such a transportation is "commerce among the States," even as to that part of the voyage which lies within the State of Illinois, while it is not denied that there may be a transportation of goods which is begun and ended within its limits, and disconnected with any carriage outside of the State, which is *not* commerce among the States.

(3.) The latter is subject to regulation by the State, and the statute of Illinois is valid as applied to it. But the former is national in its character, and its regulation is confided to Congress exclusively, by that clause of the Constitution which empowers it to regulate commerce among the States.

(4.) The cases of *Munn* v. *Illinois*, 94 U. S. 113; *Chicago, Burlington & Quincy Railroad Co.* v. *Iowa*, 94 U. S. 155; and *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164, examined in regard to this question, and held, in view of other cases decided near the same time, not to establish a contrary doctrine.

(5.) Notwithstanding what is there said, this court holds now, and has never consciously held otherwise, that a statute of a State, intended to regulate or to tax or to impose any other restriction upon the transmission of persons or property or telegraphic messages from one State to another, is not within that class of legislation which the States may enact in the absence of legislation by Congress; and that such statutes are void even as to that part of such transmission which may be within the State.

(6.) It follows that the statute of Illinois, as construed by the Supreme Court of the State, and as applied to the transaction under consideration, is forbidden by the Constitution of the United States, and the judgment of that court is reversed.

The case is stated in the opinion of the court.

*Mr. H. S. Greene*, for plaintiff in error, cited *The Daniel Ball*, 10 Wall. 557; *Railroad Co.* v. *Husen*, 95 U. S. 465, 470; *Hall* v. *De Cuir*, 95 U. S. 485; *Cooley* v. *Board of Wardens of the Port of Philadelphia*, 12 How. 299; *Lemmon* v. *People*, 20 N. Y. 562; *License Cases*, 5 How. 504; *Thames Bank* v. *Lovell*, 18 Conn. 500; *Passenger Cases*, 7 How. 283; *State Freight Case*, 15 Wall. 232; *Henderson* v. *New York*, 92 U. S. 259; *Sherlock* v. *Alling*, 93 U. S. 99; *Welton* v. *Missouri*, 91 U. S. 275; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Holmes* v. *Jennison*, 14 Pet. 540; *Brown* v. *Maryland*, 12 Wheat. 419; *New York* v. *Miln*, 11 Pet. 119; *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245; *Gilman* v. *Philadelphia*, 3 Wall. 713; *State Tax on Railway Gross Receipts*, 15 Wall. 284; *Mobile County* v. *Kimball*, 102 U. S. 690; *Webber* v. *Virginia*, 103 U. S. 344; *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164; *Chicago, Burlington & Quincy Railroad* v. *Iowa*, 94 U. S. 155; *Railroad Commissioners* v. *Yazoo & Missis-*

*sippi Valley Railroad,* 21 Am. & Eng. Railroad Cas. 6 ; *Chicago, Burlington & Quincy Railroad* v. *Parks,* 18 Ill. 460 ; *Ex parte Koehler,* 21 Am. & Eng. Railroad Cas. 58 ; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196 ; *Carton* v. *Illinois Central Railroad,* 59 Iowa, 148 ; *Hardy* v. *Atchison, Topeka & Santa Fé Railroad,* 18 Am. & Eng. Railroad Cas. 432 ; *Kaeiser* v. *Illinois Central Railroad,* 5 McCrary, 496 ; *S. C.,* 16 Am. & Eng. Railroad Cas. 40 ; *Illinois Central Railroad* v. *Stone,* 18 Am. & Eng. Railroad Cas. 416 ; *Louisville & Nashville Railroad* v. *Railroad Commissioners,* 16 Am. & Eng. Railroad Cas. 1.

*Mr. George Hunt,* Attorney-General of Illinois, for defendant in error, cited *Messenger* v. *Penn. Railroad Co.,* 36 N. J. Law, 407 ; *McDuffee* v. *Railroad Co.,* 52 N. H. 430 ; *Sandford* v. *Railroad Co.,* 24 Penn. St. 378 ; *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 How. 344 ; *Shelden* v. *Robinson,* 7 N. H. 157 ; *Gray* v. *Jackson,* 51 N. H. 9 ; *Hollister* v. *Nowlen,* 19 Wend. 234 ; *Bennett* v. *Dutton,* 10 N. H. 481 ; *New England Express Co.* v. *Maine Central Railroad,* 57 Maine, 188 ; *Munn* v. *Illinois,* 94 U. S. 113 ; *Pickford* v. *Grand Junction Railway,* 10 M. & W. 399 ; *Parker* v. *Great Western Railway,* 11 C. B. 545 ; *Commonwealth* v. *Duane,* 98 Mass. 1 ; *State* v. *Perry,* 5 Jones' Law, (N. C.) 252 ; *State* v. *Nixon,* 5 Jones' Law, (N. C.) 257 ; *Murray* v. *Hoboken Land & Improvement Co.,* 18 How. 272 ; *Kirkman* v. *Shawcrass,* 6 T. R. 14 ; *Ogden* v. *Saunders,* 12 Wheat. 213, 259 ; *Webber* v. *Virginia,* 103 U. S. 344 ; *State Tax on Railway Gross Receipts,* 15 Wall. 284 ; *Passenger Cases,* 7 How. 283 ; *Gibbons* v. *Ogden,* 9 Wheat. 1 ; *Slaughter-House Cases,* 16 Wall. 36 ; *Railroad Co.* v. *Husen,* 95 U. S. 465 ; *The James Gray* v. *The John Fraser,* 21 How. 184 ; *Packet Co.* v. *St. Louis,* 100 U. S. 423 ; *Vicksburg* v. *Tobin,* 100 U. S. 430 ; *Packet Co.* v. *Keokuk,* 95 U. S. 80 ; *Cooley* v. *Philadelphia,* 12 How. 299 ; *Inman Steamship Co.* v. *Tinker,* 94 U. S. 238 ; *Transportation Co.* v. *Parkersburg,* 107 U. S. 691 ; *Railroad Co.* v. *Fuller,* 17 Wall. 560 ; *Willson* v. *Blackbird Marsh Co.,* 2 Pet. 245 ; *Gilman* v. *Philadelphia,* 3 Wall. 713 ; *Pennsylvania*

v. *Wheeling & Belmont Bridge Co.*, 18 How. 421; *Houston* v. *Moore*, 5 Wheat. 1; *Sturgess* v. *Crowninshield*, 4 Wheat. 122; *License Cases*, 5 How. 504; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164; *Chicago, Burlington & Quincy Railroad* v. *Iowa*, 94 U. S. 155; *Illinois* v. *Wabash, St. Louis & Pacific Railway*, 104 Ill. 476; *Stone* v. *Yazoo & Mississippi Valley Railroad*, 62 Mississippi, 607; *Hardy* v. *Atchison, Topeka & Santa Fé Railroad*, 18 Am. & Eng. Railroad Cas. 432; *Stone* v. *Illinois Central Railroad*, 18 Am. & Eng. Railroad Cas. 416; *New York* v. *Miln*, 11 Pet. 102; *State* v. *Railroad Co.*, 24 West Vir. 783; *Telegraph Co.* v. *Texas*, 105 U. S. 460.

*Mr. W. C. Goudy*, for plaintiff in error, cited the following authorities not cited on *Mr. Greene's* brief: *Munn* v. *Illinois*, 94 U. S. 113; *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1; *Brown* v. *Houston*, 114 U. S. 622; *Walling* v. *Michigan*, 116 U. S. 446; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650; *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34; *Railroad Co.* v. *Fuller*, 17 Wall. 560.

MR. JUSTICE MILLER delivered the opinion of the court.

This is a writ of error to the Supreme Court of Illinois. It was argued here at the last term of this court.

The case was tried in the court of original jurisdiction on an agreed statement of facts. This agreement is short, and is here inserted in full:

"For the purposes of the trial of said cause, and to save the making of proof therein, it is hereby agreed on the part of the defendant that the allegations in the first count of the declaration are true, except that part of said count which avers that the same proportionate discrimination was made in the transportation of said property—oil-cake and corn—in the State of Illinois that was made between Peoria and the city of New York and Gilman and New York city, which averment is not admitted, because defendant claims that it is an inference from the fact that the rates charged in each case of said transporta-

tion of oil-cake and corn were through rates, but it is admitted that said averment is a proper one."

The first count in the declaration, which is referred to in this memorandum of agreement, charged that the Wabash, St. Louis and Pacific Railway Company had, in violation of a statute of the State of Illinois, been guilty of an unjust discrimination in its rates or charges of toll and compensation for the transportation of freight. The specific allegation is that the railroad company charged Elder & McKinney, for transporting twenty six thousand pounds of goods and chattels from Peoria, in the State of Illinois, to New York city, the sum of thirty nine dollars, being at the rate of fifteen cents per hundred pounds for said car-load; and that on the same day they agreed to carry and transport for Isaac Bailey and F. O. Swannell another car-load of goods and chattels from Gilman, in the State of Illinois, to said city of New York, for which they charged the sum of sixty five dollars, being at the rate of twenty five cents per hundred pounds. And it is alleged that the car-load transported for Elder & McKinney was carried eighty six miles farther in the State of Illinois than the other car-load of the same weight. This freight being of the same class in both instances, and carried over the same road, except as to the difference in the distance, it is obvious that a discrimination against Bailey & Swannell was made in the charges against them as compared with those against Elder & McKinney; and this is true whether we regard the charge for the whole distance from the terminal points in Illinois to New York city or the proportionate charge for the haul within the State of Illinois.

The language of the statute which is supposed to be violated by this transaction is to be found in Ch. 114 Rev. Stat. Illinois, § 126. It is there enacted that if any railroad corporation shall charge, collect, or receive for the transportation of any passenger or freight of any description upon its railroad, for any distance within the State, the same or a greater amount of toll or compensation than is at the same time charged, collected, or received for the transportation in the same direction of any passenger or like quantity of freight of

the same class over a greater distance of the same road, all such discriminating rates, charges, collections, or receipts, whether made directly or by means of rebate, drawback, or other shift or evasion, shall be deemed and taken against any such railroad corporation as *prima facie* evidence of unjust discrimination prohibited by the provisions of this act. The statute further provides a penalty of not over $5000 for that offence, and also that the party aggrieved shall have a right to recover three times the amount of damages sustained, with costs and attorneys' fees.

To this declaration the railroad company demurred. The demurrer was sustained by the lower court in Illinois, and judgment rendered for the defendant. This, however, was reversed by the Supreme Court of that State, and on the case being remanded the demurrer was overruled, and the defendant pleaded, among other things, that the rates of toll charged in the declaration were charged and collected for services rendered under an agreement and undertaking to transport freight from Gilman, in the State of Illinois, to New York city, in the State of New York, and that in such undertaking and agreement the portion of the services rendered or to be rendered within the State of Illinois was not apportioned separate from such entire service; that the action is founded solely upon the supposed authority of an Act of the Legislature of the State of Illinois, approved April 7, 1871; and that said act does not control or affect or relate to undertakings to transport freight from the State of Illinois to the State of New York, which falls within the operation and is wholly controlled by the terms of the third clause of Section 8 of Article I. of the Constitution of the United States, which the defendant sets up and relies upon as a complete defence and protection in said action. This question of whether the statute of Illinois, as applied to the case in hand, is in violation of the Constitution of the United States, as set forth in the plea, was also raised on the trial by a request of the defendant, the railroad company, that the court should hold certain propositions of law on the same subject, which propositions are as follows:

" The court holds as law, that as the tolls or rates of com-

pensation charged and collected by the defendant, in the instance in question, were for transportation service rendered in transporting freight from a point in the State of Illinois to a point in the State of New York, under an entire contract or undertaking to transport such freight the whole distance between such points; that the Act of the General Assembly of the State of Illinois, approved May 2d, 1873, entitled 'An Act to prevent extortion and unjust discrimination in the rates charged for the transportation of passengers and freight on railroads in this State, and to punish the same, and prescribe a mode of procedure and rules of evidence in relation thereto, and to repeal an act entitled "An Act to prevent unjust discrimination and extortion in the rates to be charged by the different railroads in the State for the transportation of freight on said roads," approved April 7, 1871,' does not apply to or control such tolls and charges, nor can the defendant be held liable in this action for the penalties prescribed by said act.

"The court further holds as law, that said act in relation to extortion and unjust discrimination cannot apply to transportation service rendered partly without the State, and consisting of the transportation of freight from within the State of Illinois to the State of New York, and that said act cannot operate beyond the limits of the State of Illinois.

"The court further holds as matter of law, that the transportation in question falls within the proper description of 'commerce among the States,' and as such can only be regulated by the Congress of the United States under the terms of the third clause of Section eight of Article one of the Constitution of the United States."

All of these propositions were denied by the court, and judgment rendered against the defendant, which judgment was affirmed by the Supreme Court on appeal.

The matter thus presented, as to the controlling influence of the Constitution of the United States over this legislation of the State of Illinois, raises the question which confers jurisdiction on this court. Although the precise point presented by this case may not have been heretofore decided by this court, the general subject of the power of the State legislatures to

regulate taxes, fares, and tolls for passengers and transportation of freight over railroads within their limits has been very much considered recently :—*State Freight Tax Case*, 15 Wall. 232; *Munn* v. *Illinois*, 94 U. S. 113; *Chicago, Burlington & Quincy Railroad* v. *Iowa*, 94 U. S. 155; *Peik* v. *Northwestern Railway*, 94 U. S. 164; *Stone* v. *Farmers' Loan and Trust Co.*, 116 U. S. 307; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 204; *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34 :— and the question how far such regulations, made by the States and under State authority, are valid or void, as they may affect the transportation of goods through more than one State, in one voyage, is not entirely new here. The Supreme Court of Illinois, in the case now before us, conceding that each of these contracts was in itself a unit, and that the pay received by the Illinois Railroad Company was the compensation for the entire transportation from the point of departure in the State of Illinois to the city of New York, holds, that while the statute of Illinois is inoperative upon that part of the contract which has reference to the transportation outside of the State, it is binding and effectual as to so much of the transportation as was within the limits of the State of Illinois, *The People* v. *The Wabash, St. Louis & Pacific Railway*, 104 Ill. 476; and, undertaking for itself to apportion the rates charged over the whole route, decides that the contract and the receipt of the money for so much of it as was performed within the State of Illinois violate the statute of the State on that subject.

If the Illinois statute could be construed to apply exclusively to contracts for a carriage which begins and ends within the State, disconnected from a continuous transportation through or into other States, there does not seem to be any difficulty in holding it to be valid. For instance, a contract might be made to carry goods for a certain price from Cairo to Chicago, or from Chicago to Alton. The charges for these might be within the competency of the Illinois Legislature to regulate. The reason for this is that both the charge and the actual transportation in such cases are exclusively confined to the limits of the territory of the State, and is not commerce

among the States, or interstate commerce, but is exclusively commerce within the State.    So far, therefore, as this class of transportation, as an element of commerce, is affected by the statute under consideration, it is not subject to the constitutional provision concerning commerce among the States.    It has often been held in this court, and there can be no doubt about it, that there is a commerce wholly within the State which is not subject to the constitutional provision, and the distinction between commerce among the States and the other class of commerce between the citizens of a single State, and conducted within its limits exclusively, is one which has been fully recognized in this court, although it may not be always easy, where the lines of these classes approach each other, to. distinguish between the one and the other.    *The Daniel Ball,* 10 Wall. 557; *Hall* v. *De Cuir,* 95 U. S. 485; *Telegraph Co.* v. *Texas,* 105 U. S. 460.

It might admit of question whether the statute of Illinois, now under consideration, was designed by its framers to affect any other class of transportation than that which begins and ends within the limits of the State.    The Supreme Court of Illinois having in this case given an interpretation which makes it apply to what we understand to be commerce among the States, although the contract was made within the State of Illinois, and a part of its performance was within the same State, we are bound, in this court, to accept that construction. It becomes, therefore, necessary to inquire whether the charge exacted from the shippers in this case was a charge for interstate transportation, or was susceptible of a division which would allow so much of it to attach to commerce strictly within the State, and so much more to commerce in other States.    The transportation, which is the subject-matter of the contract, being the point on which the decision of the case must rest, was it a transportation limited to the State of Illinois, or was it a transportation covering all the lines between Gilman in the one case and Peoria in the other in the State of Illinois, and the city of New York in the State of New York?

The Supreme Court of Illinois does not place its judgment

in the present case on the ground that the transportation and the charge are exclusively State commerce, but, conceding that it may be a case of commerce among the States, or interstate commerce, which Congress would have the right to regulate if it had attempted to do so, argues that this statute of Illinois belongs to that class of commercial regulations which may be established by the laws of a State until Congress shall have exercised its power on that subject; and to this proposition a large part of the argument of the Attorney-General of the State before us is devoted, although he earnestly insists that the statute of Illinois which is the foundation of this action is not a regulation of commerce within the meaning of the Constitution of the United States. In support of its view of the subject the Supreme Court of Illinois cites the cases of *Munn* v. *Illinois, Chicago, Burlington & Quincy Railroad* v. *Iowa,* and *Peik* v. *Northwestern Railway,* above referred to. It cannot be denied that the general language of the court in these cases, upon the power of Congress to regulate commerce, may be susceptible of the meaning which the Illinois court places upon it.

In *Munn* v. *Illinois,* 94 U. S. 113, 135, the language of this court upon that subject is as follows:

"We come now to consider the effect upon this statute of the power of Congress to regulate commerce. It was very properly said, in the case of the *State Tax on Railway Gross Receipts,* 15 Wall. 293, that 'it is not everything that affects commerce that amounts to a regulation of it, within the meaning of the Constitution.' The warehouses of these plaintiffs in error are situated and their business carried on exclusively within the limits of the State of Illinois. They are used as instruments by those engaged in State as well as those engaged in interstate commerce, but they are no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another. Incidentally they may become connected with interstate commerce, but not necessarily so. Their regulation is a thing of domestic concern, and certainly, until Congress acts in reference to their interstate relations, the

State may exercise all the powers of government over them, even though in so doing it may indirectly operate upon commerce outside its immediate jurisdiction. We do not say that a case may not arise in which it will be found that a State, under the form of regulating its own affairs, has encroached upon the exclusive domain of Congress in respect to interstate commerce, but we do say that, upon the facts as they are represented to us in this record, that has not been done."

In the case of *The Chicago, Burlington & Quincy Railroad* v. *Iowa*, 94 U. S. 155, 163, which directly related to railroad transportation, the language is as follows:

"The objection, that the statute complained of is void, because it amounts to a regulation of commerce among the States, has been sufficiently considered in the case of *Munn* v. *Illinois*. This road, like the warehouse in that case, is situated within the limits of a single State. Its business is carried on there, and its regulation is a matter of domestic concern. It is employed in State as well as in interstate commerce, and, until Congress acts, the State must be permitted to adopt such rules and regulations as may be necessary for the promotion of the general welfare of the people within its own jurisdiction, even though in doing so those without may be indirectly affected."

But the strongest language used by this court in these cases is to be found in *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164, 177-8, as follows:

"As to the effect of the statute as a regulation of interstate commerce. The law is confined to State commerce, or such interstate commerce as directly affects the people of Wisconsin. Until Congress acts in reference to the relations of this company to interstate commerce, it is certainly within the power of Wisconsin to regulate its fares, etc., so far as they are of domestic concern. With the people of Wisconsin this company has domestic relations. Incidentally, these may reach beyond the State. But certainly, until Congress undertakes to legislate for those who are without the State, Wisconsin may provide for those within, even though it may indirectly affect those without."

These extracts show that the question of the right of the State to regulate the rates of fares and tolls on railroads, and how far that right was affected by the commerce clause of the Constitution of the United States, was presented to the court in those cases. And it must be admitted that, in a general way, the court treated the cases then before it as belonging to that class of regulations of commerce which, like pilotage, bridging navigable rivers, and many others, could be acted upon by the States in the absence of any legislation by Congress on the same subject.

By the slightest attention to the matter it will be readily seen that the circumstances under which a bridge may be authorized across a navigable stream within the limits of a State, for the use of a public highway, and the local rules which shall govern the conduct of the pilots of each of the varying harbors of the coasts of the United States, depend upon principles far more limited in their application and importance than those which should regulate the transportation of persons and property across the half or the whole of the continent, over the territories of half a dozen States, through which they are carried without change of car or breaking bulk.

Of the members of the court who concurred in those opinions, there being two dissentients, but three remain, and the writer of this opinion is one of the three. He is prepared to take his share of the responsibility for the language used in those opinions, including the extracts above presented. He does not feel called upon to say whether those extracts justify the decision of the Illinois court in the present case. It will be seen, from the opinions themselves, and from the arguments of counsel presented in the reports, that the question did not receive any very elaborate consideration, either in the opinions of the court or in the arguments of counsel. And the question how far a charge made for a continuous transportation over several States, which included a State whose laws were in question, may be divided into separate charges for each State, in enforcing the power of the State to regulate the fares of its railroads, was evidently not fully considered. These three cases, with others concerning the same subject, were argued at

the same time by able counsel, and in relation to the different laws affecting the subject, of the States of Illinois, Iowa, Wisconsin, and Minnesota; the main question in all the cases being the right of the State to establish any limitation upon the power of the railroad companies to fix the price at which they would carry passengers and freight. It was strenuously denied, and very confidently, by all the railroad companies, that any legislative body whatever had a right to limit the tolls and charges to be made by the carrying companies for transportation. And the great question to be decided, and which was decided, and which was argued in all those cases, was the right of the State within which a railroad company did business to regulate or limit the amount of any of these traffic charges.

The importance of that question overshadowed all others; and the case of *Munn* v. *Illinois* was selected by the court as the most appropriate one in which to give its opinion on that subject, because that case presented the question of a private citizen, or unincorporated partnership, engaged in the warehousing business in Chicago, free from any claim of right or contract under an act of incorporation of any State whatever, and free from the question of continuous transportation through several States. And in that case the court was presented with the question, which it decided, whether any one engaged in a public business, in which all the public had a right to require his service, could be regulated by acts of the legislature in the exercise of this public function and public duty, so far as to limit the amount of charges that should be made for such services.

The railroad companies' set up another defence, apart from denying the general right of the legislature to regulate transportation charges, namely, that in their charters from the States they each had a contract, express or implied, that they might regulate and establish their own fares and rates of transportation. These two questions were of primary importance; and though it is true that, as incidental or auxiliary to these, the question of the exclusive right of Congress to make such regulations of charges as any legislative power had the right to make, to the exclusion of the States, was presented, it

received but little attention at the hands of the court, and was passed over with the remarks in the opinions of the court which have been cited.

The case of the *State Freight Tax*, 15 Wall. 232, which was decided only four years before these cases, held an act of the Legislature of Pennsylvania void, as being in conflict with the commerce clause of the Constitution of the United States, which levied a tax upon all freight carried through the State by any railroad company, or into it from any other State, or out of it into any other State, and valid as to all freight the carriage of which was begun and ended within the limits of the State, because the former was a regulation of interstate commerce, and the latter was a commerce solely within the State which it had a right to regulate. And the question now under consideration, whether these statutes were of a class which the legislatures of the States could enact in the absence of any act of Congress on the subject, was considered and decided in the negative.

It is impossible to see any distinction in its effect upon commerce of either class, between a statute which regulates the charges for transportation, and a statute which levies a tax for the benefit of the State upon the same transportation; and, in fact, the judgment of the court in the *State Freight Tax Case* rested upon the ground that the tax was always added to the cost of transportation, and thus was a tax in effect upon the privilege of carrying the goods through the State. It is also very difficult to believe that the court consciously intended to overrule the first of these cases without any reference to it in the opinion.

At the very next term of the court after the delivery of these opinions, the case of *Hall* v. *De Cuir*, 95 U. S. 485, was decided, in which the same point was considered, in reference to a statute of the State of Louisiana which attempted to regulate the carriage of passengers upon railroads, steamboats, and other public conveyances, and which provided that no regulations of any companies engaged in that business should make any discrimination on account of race or color. This statute by its terms was limited to persons engaged in that class of

business within the State, as is the one now under considera-
tion, and the case presented under the statute was that of
a person of color who took passage from New Orleans for
Hermitage, both places being within the limits of the State of
Louisiana, and was refused accommodations in the general
cabin on account of her color.    In regard to this the court de-
clared that, "for the purposes of this case, we must treat the
Act of Louisiana of February 23, 1869, as requiring those en-
gaged in interstate commerce to give all persons travelling
in that State, upon the public conveyances employed in such
business, equal rights and privileges in all parts of the convey-
ance, without distinction or discrimination on account of race
or color.  .  .  .  We have nothing whatever to do with it as
a regulation of internal commerce, or as affecting anything
else than commerce among the States."

And, speaking in reference to the right of the States in cer-
tain classes of interstate commerce to pass laws regulating
them, the opinion says:

"The line which separates the powers of the States from
this exclusive power of Congress is not always distinctly
marked, and oftentimes it is not easy to determine on which
side a particular case belongs.    Judges not unfrequently differ
in their reasons for a decision in which they concur.    Under
such circumstances it would be a useless task to undertake to
fix an arbitrary rule by which the line must, in all cases, be
located.    It is far better to leave a matter of such delicacy to
be settled in each case upon a view of the particular rights in-
volved.    But we think it may safely be said that State legis-
lation which seeks to impose a direct burden upon interstate
commerce, or to interfere directly with its freedom, does en-
croach upon the exclusive power of Congress.    The statute
now under consideration, in our opinion, occupies that position.
It does not act upon the business through the local instruments
to be employed after coming within the State, but directly
upon the business as it comes into the State from without, or
goes out from within.    While it purports only to control the
carrier when engaged within the State, it must necessarily in-
fluence his conduct to some extent in the management of his

business throughout his entire voyage. . . . It was to meet just such a case that the commercial clause in the Constitution was adopted. The river Mississippi passes through or along the borders of ten different States, and its tributaries reach many more. The commerce upon these waters is immense, and its regulation clearly a matter of national concern. If each State was at liberty to regulate the conduct of carriers while within its jurisdiction, the confusion likely to follow could not but be productive of great inconvenience and unnecessary hardship. Each State could provide for its own passengers and regulate the transportation of its own freight, regardless of the interests of others. Nay, more, it could prescribe rules by which the carrier must be governed within the State in respect to passengers and property brought from without. On one side of the river or its tributaries he might be required to observe one set of rules, and on the other, another. Commerce cannot flourish in the midst of such embarrassments."

The applicability of this language to the case now under consideration, of a continuous transportation of goods from New York to Central Illinois, or from the latter to New York, is obvious, and it is not easy to see how any distinction can be made. Whatever may be the instrumentalities by which this transportation from the one point to the other is effected, it is but one voyage, as much so as that of the steamboat on the Mississippi River. It is not the railroads themselves that are regulated by this act of the Illinois Legislature so much as the charge for transportation, and, in language just cited, if each one of the States through whose territories these goods are transported can fix its own rules for prices, for modes of transit, for times and modes of delivery, and all the other incidents of transportation to which the word "regulation" can be applied, it is readily seen that the embarrassments upon interstate transportation, as an element of interstate commerce, might be too oppressive to be submitted to. "It was," in the language of the court cited above, "to meet just such a case that the commerce clause of the Constitution was adopted."

It cannot be too strongly insisted upon that the right of con-

tinuous transportation from one end of the country to the other
is essential in modern times to that freedom of commerce from
the restraints which the State might choose to impose upon it,
that the commerce clause was intended to secure. This clause,
giving to Congress the power to regulate commerce among the
States and with foreign nations, as this court has said before, was
among the most important of the subjects which prompted the
formation of the Constitution. *Cook* v. *Pennsylvania*, 97 U. S.
566, 574; *Brown* v. *Maryland*, 12 Wheat. 419, 446. And it
would be a very feeble and almost useless provision, but poorly
adapted to secure the entire freedom of commerce among the
States which was deemed essential to a more perfect union by
the framers of the Constitution, if, at every stage of the trans-
portation of goods and chattels through the country, the State
within whose limits a part of this transportation must be done
could impose regulations concerning the price, compensation,
or taxation, or any other restrictive regulation interfering with
and seriously embarrassing this commerce.

The argument on this subject can never be better stated than
it is by Chief-Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat.
1, 195–6. He there demonstrates that commerce among the
States, like commerce with foreign nations, is necessarily a com-
merce which crosses State lines, and extends into the States,
and the power of Congress to regulate it exists wherever that
commerce is found. Speaking of navigation as an element of
commerce, which it is, only, as a means of transportation, now
largely superseded by railroads, he says: " The power of Con-
gress, then, comprehends navigation within the limits of every
State in the Union, so far as that navigation may be, in any
manner, connected with ' commerce with foreign nations, or
among the several States, or with the Indian tribes.' It may,
of consequence, pass the jurisdictional line of New York and
act upon the very waters [the Hudson River] to which the pro-
hibition now under consideration applies," p. 197. So the same
power may pass the line of the State of Illinois and act upon
its restriction upon the right of transportation extending over
several States, including that one.

In the case of *Telegraph Co.* v. *Texas*, 105 U. S. 460, 465,

the court held that "a telegraph company occupies the same relation to commerce as a carrier of messages that a railroad company does as a carrier of goods," and that "both companies are instruments of commerce, and their business is commerce itelf." And relying upon the case of *The State Freight Tax,* 15 Wall. 232, already referred to, the court said that a tax by the State of Texas upon *all* messages carried within its borders was forbiden by the commerce clause of the Constitution, as being a tax upon commerce among the States; and observed that "the tax is the same on every message sent, and because it is sent, without regard to the distance carried or the price charged. . . . Clearly, if a fixed tax for every two thousand pounds of freight carried is a tax on the freight, or for every measured ton of a vessel a tax on tonnage, or for every passenger carried a tax on the passenger, or for the sale of goods a tax on the goods, this must be a tax on the messages. As such, so far as it operates on private messages sent out of the State, it is a regulation of foreign and interstate commerce and beyond the power of the State. That is fully established by the cases already cited."

In the case of *Welton* v. *Missouri,* 91 U. S. 275, 280, it was said: "It will not be denied that that portion of commerce with foreign countries and between the States which consists in the transportation and exchange of commodities is of national importance, and admits and requires uniformity of regulation. The very object of investing this power in the general government was to insure this uniformity against discriminating State legislation."

And in *County of Mobile* v. *Kimball,* 102 U. S. 691, 702, the same idea is very clearly stated in the following language: "Commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce as thus defined there can be only one system of rules, applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon

it by separate States is not, therefore, permissible. Language affirming the exclusiveness of the grant of power over commerce as thus defined may not be inaccurate, when it would be so if applied to legislation upon subjects which are merely auxiliary to commerce."

In the case of *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 204, decided two years ago, the court declared without dissent that, "It needs no argument to show that the commerce with foreign nations and between the States, which consists in the transportation of persons and property between them, is a subject of national character and requires uniformity of regulation," and still later, in the case of *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34, the whole subject is very fully re-examined ; and a tax of the State of Tennessee upon sleeping-cars of that company, which were used in carrying passengers through the State, and into it and out of it, was held void as a regulation of commerce among the States.

The case of *Stone* v. *The Farmers' Loan and Trust Co.*, 116 U. S. 307, argued at the same term as the present, while it does not decide the latter, evidently does not support the construction placed by the Supreme Court of Illinois upon the case of *Munn* v. *Illinois*, and the other cases on which the court relies.

We must, therefore, hold that it is not, and never has been, the deliberate opinion of a majority of this court that a statute of a State which attempts to regulate the fares and charges by railroad companies within its limits, for a transportation which constitutes a part of commerce among the States, is a valid law.

Let us see precisely what is the degree of interference with transportation of property or persons from one State to another which this statute proposes. A citizen of New York has goods which he desires to have transported by the railroad companies from that city to the interior of the State of Illinois. A continuous line of rail over which a car loaded with these goods can be carried, and is carried habitually, connects the place of shipment with the place of delivery. He undertakes to make a contract with a person engaged in the carrying business at the end of this route from whence the goods are to

start, and he is told by the carrier, "I am free to make a fair and reasonable contract for this carriage to the line of the State of Illinois, but when the car which carries these goods is to cross the line of that State, pursuing at the same time this continuous track, I am met by a law of Illinois which forbids me to make a free contract concerning this transportation within that State, and subjects me to certain rules by which I am to be governed as to the charges which the same railroad company in Illinois may make, or has made, with reference to other persons and other places of delivery." So that while that carrier might be willing to carry these goods from the city of New York to the city of Peoria at the rate of fifteen cents per hundred pounds, he is not permitted to do so because the Illinois railroad company has already charged at the rate of twenty five cents per hundred pounds for carriage to Gilman, in Illinois, which is eighty six miles shorter than the distance to Peoria.

So, also, in the present case, the owner of corn, the principal product of the country, desiring to transport it from Peoria, in Illinois, to New York, finds a railroad company willing to do this at the rate of fifteen cents per hundred pounds for a car-load, but is compelled to pay at the rate of twenty five cents per hundred pounds, because the railroad company has received from a person residing at Gilman twenty five cents per hundred pounds for the transportation of a car-load of the same class of freight over the same line of road from Gilman to New York. This is the result of the statute of Illinois, in its endeavor to prevent unjust discrimination, as construed by the Supreme Court of that State. The effect of it is, that whatever may be the rate of transportation per mile charged by the railroad company from Gilman to Sheldon, a distance of twenty three miles, in which the loading and the unloading of the freight is the largest expense incurred by the railroad company, the same rate per mile must be charged from Peoria to the city of New York.

The obvious injustice of such a rule as this, which railroad companies are by heavy penalties compelled to conform to, in regard to commerce among the States, when applied to trans-

portation which includes Illinois in a long line of carriage through several States, shows the value of the constitutional provision which confides the power of regulating interstate commerce to the Congress of the United States, whose enlarged view of the interests of all the States, and of the railroads concerned, better fits it to establish just and equitable rules.

Of the justice or propriety of the principle which lies at the foundation of the Illinois statute it is not the province of this court to speak. As restricted to a transportation which begins and ends within the limits of the State it may be very just and equitable, and it certainly is the province of the State legislature to determine that question. But when it is attempted to apply to transportation through an entire series of States a principle of this kind, and each one of the States shall attempt to establish its own rates of transportation, its own methods to prevent discrimination in rates, or to permit it, the deleterious influence upon the freedom of commerce among the States and upon the transit of goods through those States cannot be overestimated. That this species of regulation is one which must be, if established at all, of a general and national character, and cannot be safely and wisely remitted to local rules and local regulations, we think is clear from what has already been said. And if it be a regulation of commerce, as we think we have demonstrated it is, and as the Illinois court concedes it to be, it must be of that national character, and the regulation can only appropriately exist by general rules and principles, which demand that it should be done by the Congress of the United States under the commerce clause of the Constitution.

The judgment of the Supreme Court of Illinois is therefore *Reversed, and the case remanded to that court for further proceedings in conformity with this opinion.*

MR. JUSTICE BRADLEY, with whom concurred THE CHIEF JUSTICE and MR. JUSTICE GRAY, dissenting.

The Chief Justice, Mr. Justice Gray, and myself dissent from the opinion and judgment of the court in this case, and I am authorized to state the reasons upon which our dissent is founded.

The Wabash, St. Louis and Pacific Railway Company, an Illinois corporation, plaintiff in error, was sued by the State of Illinois to recover a penalty for the breach of its laws, passed "to prevent extortion and unjust discrimination in the rates charged for the transportation of passengers and freight on railroads in the State." The law sued on was originally passed in 1871, and revised in 1873, and the material portions of its most important section are in the following words, to wit:

"If any such railroad corporation shall charge, collect, or receive for the transportation of any passenger or freight of any description, upon its railroad, for any distance, within this State, the same or a greater amount of toll or compensation than is at the same time charged, collected, or received for the transportation, in the same direction, of any passenger or like quantity of freight, of the same class, over a greater distance of the same railroad; . . . or if it shall charge, collect, or receive from any person or persons, for the use and transportation of any railroad car or cars upon its railroad, for any distance, the same or a greater amount of toll or compensation than is at the same time charged, collected, or received from any other person or persons, for the use and transportation of any railroad car of the same class or number, for a like purpose, being transported in the same direction, over a greater distance of the same railroad; . . . all such discriminating rates, charges, collections, or receipts, whether made directly or by means of rebate, drawback, or other shift or evasion, shall be deemed and taken, against any such railroad corporation, as *prima facie* evidence of unjust discrimination, prohibited by the provisions of this act; . . . *Provided, however*, that nothing herein contained shall be so construed as to prevent railroad corporations from issuing commutation, excursion, or thousand-mile tickets, as the same are now issued by such corporations."

A penalty of not less than $1000 and not more than $5000 for the first offence is imposed for the violation of the law; and it was for this penalty that the company was sued in the Ford County Circuit Court.

The declaration alleged, in substance, that the company

charged certain parties fifteen cents per hundred pounds for carrying a load of freight from Peoria, in the State of Illinois, to New York, one hundred and nine miles of the distance being in Illinois, whilst at the same time it charged certain other parties twenty five cents per hundred pounds for carrying a like load of the same class of freight from Gilman, also in the State of Illinois, to New York, twenty three miles of the distance being in Illinois, both places being on the line of the road. This allegation was substantially admitted, and judgment was finally rendered in favor of the State, and was sustained by the Supreme Court of the State, to which the present writ of error was directed.

The main point insisted on by the railway company in its defence was, that the law on which the action was founded is unconstitutional in its application to their case, as being a regulation of interstate commerce. They also contended that a gross charge from Peoria or Gilman to New York was no evidence of any particular charge within the State of Illinois.

The construction given to the law by the Supreme Court of Illinois is to be received by us, on a writ of error brought for the purpose of questioning its constitutionality. That construction is clearly exhibited in the following announcement of the opinion of that court when the case was brought before it a second time. The court says:

"We see no reason to depart from the conclusion reached in this case when it was here before. See *People* v. *W., St. L. & P. Railway Co.*, 104 Ill. 476. But to avoid misapprehension, we deem it desirable to state explicitly that we disclaim any idea that Illinois has authority to regulate commerce in any other State. We understand and simply hold that, in the absence of anything showing to the contrary, a single and entire contract to carry for a gross sum from Gilman, in this State, to the city of New York, implies necessarily that that sum is charged proportionately for the carriage on every part of that distance; and that a single and entire contract to carry for a gross sum from Peoria, in this State, to the city of New York, implies the same thing; and that, therefore, when it is shown that there is charged for carriage upon the same line

less from Peoria to New York (the greater distance) than from Gilman to New York (the less distance), and nothing is shown to the effect that such inequality in charge is all for carriage entirely beyond the limits of this State, a *prima facie* case is made out of unjust discrimination under our statute occurring within this State. We hold that the excess in the charge for the less distance presumably affects every part of the line of carriage between Gilman and the State line proportionately with the balance of the line. The judgment is affirmed." *Wabash, St. Louis & Pacific Railway* v. *Illinois*, 105 Ill. 236.

We have no doubt that this view of the presumed equal distribution of the charge to every part of the route is correct. If one-tenth, or any other proportion, of the whole route of transportation was in Illinois, the clear presumption is, if nothing be shown to the contrary (as nothing was shown), that the like proportion of the whole charge was made for the transportation in that State.

The principal question in this case, therefore, is whether, in the absence of congressional legislation, a State legislature has the power to regulate the charges made by the railroads of the State for transporting goods and passengers to and from places within the State, when such goods or passengers are brought from, or carried to, points without the State, and are, therefore, in the course of transportation from another State, or to another State. It is contended that as such transportation is commerce between or among different States, the power does not exist. The majority of the court so hold. We feel obliged to dissent from that opinion. We think that the State does not lose its power to regulate the charges of its own railroads in its own territory, simply because the goods or persons transported have been brought from or are destined to a point beyond the State in another State.

The case before us is not embarrassed by any allegation of a contract between the State and the company ; it is a question of the power to regulate, pure and simple. The State has never contracted away or attempted to contract away this power.

It is also unembarrassed by any Federal legislation on the subject. No one disputes that Congress might, if it saw fit, under its power to regulate commerce among the several States, regulate the matter under consideration ; but it has not done so. The question rests solely and entirely upon the power of the State, when unrestrained by any contract, or by any action of the legislative department of the United States. Does it follow, then, that because Congress has the power to regulate this matter (though it has not exercised that power), therefore the State is divested of all power of regulation ? That is the question before us.

We had supposed that this question was concluded by the previous decisions of this court: that all local arrangements and regulations respecting highways, turnpikes, railroads, bridges, canals, ferries, dams, and wharves, within the State, their construction and repair, and the charges to be made for their use, though materially affecting commerce, both internal and external, and thereby incidentally operating to a certain extent as regulations of interstate commerce, were within the power and jurisdiction of the several States. That is still our opinion.

It is almost a work of supererogation to refer to the cases. They are legion. A few only will be selected and referred to.

The first great case on the subject was that of *Willson* v. *The Blackbird Creek Co.*, 2 Pet. 245, 252, where the State of Delaware had authorized a dam in a navigable tide-water creek of that State, communicating with Delaware Bay ; and Chief Justice Marshall, delivering the unanimous opinion of the court, said : " The value of the property on its banks must be enhanced by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce these objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved to the States. But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the Constitution or a law of the United States,

is an affair between the government of Delaware and its citizens, of which this court can take no cognizance. The counsel for the plaintiff in error insist that it comes in conflict with the power of the United States ' to regulate commerce with foreign nations and among the several States.' If Congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the Middle and Southern States, we should feel not much difficulty in saying that a State law coming in conflict with such act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question. We do not think that the act empowering the Blackbird Creek Marsh Company to place a dam across the creek can, under all the circumstances of the case, be considered as repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject."

This case was, in all things, affirmed by the later case of *Gilman* v. *Philadelphia*, 3 Wall. 713. The Legislature of Pennsylvania authorized the city of Philadelphia to erect a permanent bridge across the Schuylkill River (a navigable water), at the foot of Chestnut Street. It was sought to restrain the erection of this bridge on the same grounds which had been urged in the Blackbird Creek case ; but the Circuit Court of the United States refused to interfere, and dismissed a bill for an injunction. The decision was sustained by this court, which held that it was for Congress to determine when its full power to regulate commerce should be brought into activity, and as to the regulations and sanctions which should be provided ; and that, until the dormant power of the Constitution is awakened and made effective by appropriate legislation, the reserved power of the States is plenary, and its exercise in good faith cannot be made the subject of review by this court.

These principles are reaffirmed in the still more recent case of *Escanaba Company* v. *Chicago*, 107 U. S. 678, 683. In that case the authorities of Chicago, under the powers conferred upon them by the Legislature of Illinois, regulated the times for opening and closing the draws in the bridges crossing the Chicago River, so as to accommodate the local travel across them at certain times, and to allow the passage of vessels at others. This operated as a regulation of the commerce on the river, including interstate and foreign, as well as domestic commerce. But there being no legislation of Congress to the contrary, this court held that the power was constitutionally exercised. Commerce was affected; commerce was even incidentally regulated; but the jurisdiction of the State, and of the city acting under State authority, was unhesitatingly recognized by the court. Mr. Justice Field, delivering the opinion of the court, said: " The Chicago River and its branches must, therefore, be deemed navigable waters of the United States, over which Congress under its commercial power may exercise control to the extent necessary to protect, preserve, and improve their free navigation. But the States have full power to regulate within their limits matters of internal police, including in that general designation whatever will promote the peace, comfort, convenience, and prosperity of their people. This power embraces the construction of roads, canals, and bridges, and the establishment of ferries, and it can generally be exercised more wisely by the States than by a distant authority. . . . Nowhere could the power to control the bridges in that city, their construction, form, and strength, and the size of their draws, and the manner and times of using them, be better vested than with the State, or the authorities of the city upon whom it has devolved that duty. When its power is exercised so as to unnecessarily obstruct the navigation of the river or its branches, Congress may interfere and remove the obstruction. . . . But until Congress acts on the subject, the power of the State over bridges across its navigable streams is plenary."

The doctrines announced in these cases apply not only to dams in, and bridges over, navigable streams, but to all struct-

ures and appliances in a state which may incidentally inter-
fere with commerce, or which may be erected or created for
the furtherance of commerce, whether by water or by land.
It is matter of common knowledge that from the beginning of
the government the States have exercised almost exclusive
control over roads, bridges, ferries, wharves, and harbors. No
one has doubted their right to do so. It is recognized in the
great case of *Gibbons* v. *Ogden*, 9 Wheat. 1, where Chief Justice
Marshall, after enumerating some of the powers reserved to the
States, says: " They form a portion of that immense mass of
legislation which embraces everything within the territory of a
State, not surrendered to the general government; all which
can be most advantageously exercised by the States them-
selves. Inspection laws, quarantine laws, health laws of every
description, as well as laws for regulating the internal com-
merce of a State, and those which respect turnpike roads, fer-
ries, &c., are component parts of this mass." And he adds
(what is very pertinent to this discussion): " No direct general
power over these objects is granted to Congress; and, conse-
quently, they remain subject to State legislation. If the legis-
lative power of the Union can reach them, it must be for
national purposes; it must be where the power is expressly
given for a special purpose, or is clearly incidental to some
power which is expressly given."

The case of *Transportation Co.* v. *Parkersburg*, 107 U. S. 691,
701, related to wharves. The city of Parkersburg had built
certain wharves for the accommodation of vessels, principally
steamboats, navigating the Ohio River. The Transportation
Company, being the owner of several steamboats plying on that
river, complained of the wharfage charges as being extortion-
ate, and an unconstitutional interference with the commerce of
the Ohio River. It was shown that the charges were imposed
by authority derived from the State laws; and we held that,
until Congress interfered, the charges for wharfage was a mat-
ter of State law and of State jurisdiction. We then said:
" Wharves, levees, and landing-places are essential to com-
merce by water, no less than a navigable channel and a clear
river. But they are attached to the land; they are private

property, real estate ; and they are primarily, at least, subject to the local State laws. . . . Until Congress has acted, the courts of the United States cannot assume control over the subject as a matter of Federal cognizance. It is Congress, and not the judicial department, to which the Constitution has given the power to regulate commerce with foreign nations and among the several States. The courts can never take the initiative on this subject."

There is a class of subjects, it is true, pertaining to interstate and foreign commerce, which require general and uniform rules for the whole country, so as to obviate unjust discriminations against any part, and in respect of which local regulations made by the States would be repugnant to the power vested in Congress, and, therefore, unconstitutional; but there are other subjects of local character and interest which not only admit of, but are generally best regulated by, State authority. This distinction is pointed out and enforced in the case of *Cooley* v. *The Port Wardens of Philadelphia*, 12 How. 299. In that case it was held that the pilotage regulations of the different ports of the country belong to the latter class, and are susceptible of State regulation. This case has been approved in several subsequent decisions. *Gilman* v. *Philadelphia*, *ubi supra ; Crandall* v. *Nevada*, 6 Wall. 35, 42 ; *Ex parte McNeill*, 13 Wall. 236 ; *Osborne* v. *Mobile*, 16 Wall. 479, 482 ; *Railroad Co.* v. *Fuller*, 17 Wall. 560, 569 ; *The Lottawanna*, 21 Wall. 558, 581, 582 ; *Packet Co.* v. *Keokuk*, 95 U. S. 80, 88 ; *Pound* v. *Turck*, 95 U. S. 459 ; *Hall* v. *De Cuir*, 95 U. S. 485, 488 ; *Wilson* v. *McNamee*, 102 U. S. 572, 575 ; *Mobile* v. *Kimball*, 102 U. S. 691, 698 ; *Packet Co.* v. *Catlettsburg*, 105 U. S. 559, 562.

It is hardly necessary to argue that, in reference to this rule, railroads, canals, turnpikes, bridges, ferries, and wharves belong to the category of local subjects, local means, and local aids of commercial intercourse. Congress may 'establish national roads, canals, and bridges, it is true ; but we speak of those (hitherto the most part) which are constructed and established under State authority ; and, in reference to these, it seems to us very clear that, in the absence of congressional

legislation to the contrary, they are not only susceptible of State regulation, but properly amenable to it, irrespective of other considerations to which we shall refer.

The highways in a State are the highways of the State. Convenient ways and means of intercommunication are the first evidence of the civilization of a people. The highways of a country are not of private but of public institution and regulation. In modern times, it is true, government is in the habit, in some countries, of letting out the construction of important highways, requiring a large expenditure of capital, to agents, generally corporate bodies created for the purpose, and giving to them the right of taxing those who travel or transport goods thereon, as a means of obtaining compensation for their outlay. But a superintending power over the highways, and the charges imposed upon the public for their use, always remains in the government. This is not only its indefeasible right, but is necessary for the protection of the people against extortion and abuse. These positions we deem to be incontrovertible. Indeed, they are adjudged law in the decisions of this court. Railroads and railroad corporations are in this category.

Now, since every railroad may be, and generally is, a medium of transportation for interstate commerce, and affects that commerce; and since the charges of fare and freight for such transportation affect and incidentally regulate that commerce; and since the railroad could not be built, and the charges upon it could not be exacted, without authority from the State, it follows as a necessary consequence that the State, in the exercise of its undoubted functions and sovereignty, does, in the establishment and regulation of railroads, to a certain and a very material extent, not only do that which affects but incidentally regulates commerce. It does so by the very act of authorizing the construction of railroads and the collection of fares and freights thereon. No one doubts its powers to do this. The very being of the plaintiffs in error, the very existence of their railroad, the very power they exercise of charging fares and freights, are all derived from the State. And yet, according to the argument of the plaintiffs in error, pursued to its legitimate consequences, the act of the State in doing all this ought to be

regarded as null and void because it operates as a regulation of commerce among the States.   Not only does the right to charge fares and freights at all come to a railroad company from the grant of the State, but the amount of such charges is also regulated by the State law, either by the charter of the company, or by legislative regulations, or by the general law that the charges shall be reasonable—and that is State law, and not United States law.   Where else but from the laws of the State does the railroad company get its right to charge any fares or freight at all?   And since its being, its franchises, its powers, its road, its right to charge, all come from the State, and are the creation of State law, how can it be contended that the State has no power of regulation over those charges, and over the conduct of the company in the transaction of its business whilst acting within the State and using its railroad lying within the bounds of the State?   *Omne majus continet in se minus.*   If the State created the company and its franchises, it surely may make regulations as to the manner of using them.

It is evident from what has been said, that the dealing of a State with a railroad corporation of its own creation, in authorizing the construction and maintenance of its road and the charge of fares and freights thereon, is, in its purpose, a matter entirely aside from that kind of regulation of commerce which is obnoxious to the provisions of the Constitution.   There is not a particle of doubt that it was the right of the State to prescribe the route of the plaintiff's road—it might be in a direction north and south, or east and west; it might be by one town, or by a different town; it was its right to prescribe how the road should be built, what means of locomotion should be used on it, how fast the trains might run, at what stations they should stop.   It was its right to prescribe its charges, and to declare that they should be uniform, or, if not uniform, how otherwise: this certainly was the right of the State at the inception of the charter, and every one of these things would most materially affect commerce, not only internal but external; and yet not one of them would be repugnant to the power of Congress to regulate commerce within the meaning of the Constitution.

Suppose the original charter of the railroad company in this case had contained precisely the provision against discriminating charges which is contained in the general law now complained of, could the company disregard the conditions of its charter, and defy the authority of the State? We think it clear that it could not. But if the State had the power to impose such a condition in the original charter, it must have the same power at any time afterwards; for the exercise of the power in the original grant would be just as repugnant to the Constitution, and no more, as the exercise of it at a subsequent period. The regulation of charges is just as unconstitutional in a charter as in a general law.

To sum up the matter in a word: we hold it to be a sound proposition of law, that the making of railroads and regulating the charges for their use is not such a regulation of commerce as to be in the remotest degree repugnant to any power given to Congress by the Constitution, so long as that power is dormant, and has not been exercised by Congress. They affect commerce, they incidentally regulate it; but they are acts in relation to the subject which the State has a perfect right to do, subject, always, to the controlling power of Congress over the regulation of commerce when Congress sees fit to act.

It is only for the sake of convenience that the State lets out its railroads to private corporations. It might construct them itself. Suppose it had done so in this case: could not the State have instituted such rates of freight and fare as it pleased? Certainly it could. It might have made them uniform, as the present law requires them to be, or it might have made them discriminative between different places, and no one could have called it to account. Instructions in the form of laws, or in the form of orders made by a State board, might have been given to the superintendents of the road, acting in behalf of the State, to adopt the one course or the other. Could the agents of the State, acting under such instructions, have been interfered with by the judicial department on the ground of unconstitutionality? Certainly not; certainly not, unless discriminations were made to the prejudice of the citizens of other States, or of the products of other States.

The State of New York built and owns the Erie Canal. Did any court ever attempt to control that State in its regulation of tolls on the canal, even though made for the purpose of affecting the relative movement of goods on the canal and the railroads of the State? We presume that no such attempt was ever made, or would be successful if made.

It is true, and this we concede, that if the laws of a State discriminate adversely to the citizens or products of other States, whether the railroads belong to the State or to private corporations, the courts might interfere on the ground of the repugnancy of such regulations to that freedom of commerce which Congress by its non-action on the subject has indicated shall exist. This has been frequently decided. *Welton* v. *Missouri*, 91 U. S. 275, 282; *Brown* v. *Houston*, 114 U. S. 622, 631, and cases there cited. But no such discrimination is made by the law in question.

We also concede that any taxes, duties, or impositions upon interstate commerce (that is, upon the commerce itself), carried on over the railroads of the State, would interfere with the freedom of such commerce, and would be repugnant to the presumed intention of Congress. This has frequently been decided. *Crandall* v. *Nevada*, 6 Wall. 35; *State Freight Tax Cases*, 15 Wall. 232; *Coe* v. *Errol*, 116 U. S. 517; and the authorities cited in the latter case. But the present is not a case of that kind, and has no semblance of likeness to it. All such discriminations, taxes, duties, and impositions are direct regulations and burdens upon the commerce itself, and come fairly within the exclusive prerogatives of Congress.

The distinction between such burdens and charges for service rendered is well explained in the case of *The Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 217, where Mr. Justice Field, delivering the unanimous opinion of the court, in relation to ferries, says: "It is true that, from the earliest period in the history of the government, the States have authorized and regulated ferries, not only over waters entirely within their limits, but over waters separating them; and it may be conceded that in many respects the States can more advantageously manage such interstate ferries than the general govern-

ment ; and that the privilege of keeping a ferry, with a right to take toll for passengers and freight, is a franchise grantable by the State, to be exercised within such limits and under such regulations as may be required for the safety, comfort, and convenience of the public.    Still the fact remains that such a ferry is a means, and a necessary means, of commercial intercourse between the States bordering on their dividing waters, and it must, therefore, be conducted without the imposition by the States of taxes or other burdens upon the commerce between them.    Freedom from such impositions does not, of course, imply exemption from reasonable charges, as compensation for the carriage of persons, in the way of tolls or fares, or from the ordinary taxation to which other property is subjected, any more than like freedom of transportation on land implies such exemption.    Reasonable charges for the use of property, either on water or land, are not an interference with the freedom of transportation between the States secured under the commercial power of Congress.    .   .   .    That freedom implies exemption from other charges than such as are imposed by way of compensation for the use of the property employed, or for the facilities afforded for its use, or as ordinary taxes upon the value of property."

This subject in many of its aspects was considered by this court in the case of *Railroad Company* v. *Maryland*, 21 Wall. 456, 471–3.    In that case, in a charter for constructing and operating a railroad from Baltimore to Washington, authority was given to the company to charge two dollars and a half for each passenger, and it was stipulated that the company should pay to the State one-fifth of the whole amount received for the transportation of passengers on the road.    The company sued for a return of the sums paid on this account, as being exacted by an unconstitutional law.    It was insisted that the reservation was equivalent to the imposition of a tax on passengers, and, therefore, a restriction of free intercourse and traffic between different States—much of the travel being that of passengers coming from, or going to, other States.    The argument that the reservation of one-fifth of the passage-money necessitated an increased charge upon the passenger

was met by this court as follows: " Had the State built the
road in question, it might to this day, unchallenged and un-
challengeable, have charged two dollars and fifty cents for
carrying a passenger between Baltimore and Washington.  So
might the railroad company under authority from the State, if
it saw fit to do so.  .  .  .  This unlimited right of the State
to charge, or to authorize others to charge, toll, freight, or
fare for transportation on its roads, canals, and railroads, arises
from the simple fact that they are its own works, or con-
structed under its authority.  It gives them being.  It has a
right to exact compensation for their use.  It has a discretion
as to the amount of that compensation.  That discretion is a
legislative—a sovereign—discretion, and in its very nature is
unrestricted and uncontrolled.  .  .  .  The exercise of [this]
power on the part of a State is very different from the imposi-
tion of a tax or duty upon the movements or operations of
commerce between the States.  Such an imposition, whether
relating to persons or goods, we have decided the States cannot
make, because it would be a regulation of commerce between
the States in a matter in which uniformity is essential to the
rights of all, and, therefore, requiring the exclusive legislation
of Congress.  *Crandall* v. *Nevada*, 6 Wall. 42 ; *State Freight
Tax Cases*, 16 Wall. 232, 279.  It is a tax because of the trans-
portation, and is, therefore, virtually a tax on the transporta-
tion, and not in any sense a compensation therefor, or for the
franchises enjoyed by the corporation that perform it.  .  .  .
The question is practically reduced to this : What amounts to
a regulation of commerce between the States?  This is often
difficult to determine.  In view, however, of the very plenary
powers which a State has always been conceded to have over
its own territory, its highways, its franchises, and its corpora-
tions, we cannot regard the stipulation in question as amount-
ing to either of these unconstitutional acts.  It is not within
the category of such acts.  It may incidentally affect trans-
portation, it is true; but so does every burden or tax imposed
on corporations or persons engaged in that business.  Such
burdens, however, are imposed *diverso intuitû,* and in the exer-
cise of an undoubted power."

But it is needless to multiply citations which establish or recognize the principles which govern the present case. The very point in question has been already expressly decided by this court. We refer to the case of *Peik* v. *The Chicago & Northwestern Railway*, 94 U. S. 164, 175, 177–8. That was a bill filed by the bondholders of the company to restrain the Railroad Commissioners of Wisconsin from enforcing a law of that State limiting the rate of charges for transporting passengers and freights on the railroads of the State. The bill, amongst other things, complained that the classes of freight established by § 3 of the act were different from those established by the laws of Illinois, Iowa, and Minnesota, for the transportation of freight upon the railroads of the same company in those States, and rendered it practically impossible to carry on the business of transporting freight from Wisconsin to either of those States; and that the 18th section (limiting the rates) was a regulation of interstate commerce. The act excepted from its operation the case of freight or passengers carried from one State to another State entirely through or across the State of Wisconsin. It did operate on freight and passengers carried from another State to any point within the State of Wisconsin, or from any such point to another State. The Chief Justice, in delivering the opinion of the court, states the precise question to be decided, as follows: "These suits present the single question of the power of the Legislature of Wisconsin to provide by law for a maximum of charge by the Chicago and Northwestern Railway Company for fare and freight upon the transportation of persons and property carried within the State, or taken up outside the State and brought within it, or taken up inside and carried without." He then, after disposing of certain other questions relating to the consolidation of the company with an Illinois company, disposes of the main question as follows: "As to the effect of the statute as a regulation of interstate commerce. The law is confined to State commerce, or such interstate commerce as directly affects the people of Wisconsin. Until Congress acts in reference to the relations of this company to interstate commerce, it is certainly within the power of Wisconsin to regu-

late its fares, &c., so far as they are of domestic concern. With the people of Wisconsin this company has domestic relations. Incidentally, these may reach beyond the State. But certainly, until Congress undertakes to legislate for those who are without the State, Wisconsin may provide for those within, even though it may indirectly affect those without." The law was sustained, and the bill of complaint was dismissed.

We do not see how this case can be distinguished from that now under consideration. The fact that in Peik's case there was a classification of freights and a limitation of charges, and in the present case a prohibition of discrimination in the charges, is a distinction without a difference. The opinion is brief, it is true, but all the principles involved in it were so fully discussed in the cases immediately preceding, beginning with that of *Munn* v. *Illinois*, that no extended discussion of Peik's case was deemed necessary. All the justices who concurred in the opinion were entirely satisfied with it. The cases were all argued at the same time, or in reference to each other, and were considered together. But there stands the judgment of the court, and, in our apprehension, the judgment in the present case is directly opposed to it.

We have omitted to cite a number of cases corroborating the views we have expressed. The case of *State Tax on Railway Gross Receipts*, 15 Wall. 284, is weighted with arguments and considerations in this direction. We would also refer to the cases of *Osborne* v. *Mobile*, 16 Wall. 479; *Railroad Co.* v. *Fuller*, 17 Wall. 560; *Railroad Commission Cases*, 116 U. S. 307, 334, 335.

It is supposed that the decision in *Hall* v. *De Cuir*, 95 U. S. 485, 488–9, supports the contention of the plaintiffs in error. We think not. What was that case? A statute of Louisiana, as construed by its courts, prohibited those engaged in the business of carrying passengers, in that State (including those engaged in interstate commerce), from making any discrimination on account of race or color in the use of the accommodations of their conveyances—a direct regulation of commerce, and within the reason of the tax cases before referred to. A steamer which regularly plied between New Orleans and

Vicksburg had a cabin specially set apart for white persons, and De Cuir, a colored person, being refused admission to that cabin, sued for damages. We held that the law (as above suggested) was a direct regulation of commerce and a burden upon it. It compelled the steamboat proprietor to place colored persons travelling from one place to another in Louisiana in the cabin set apart for white persons, many of whom were bound to another State; and, therefore, in its operation was a regulation of interstate commerce. It was against the rule that, in the absence of action by Congress, commerce must remain free and untrammelled. By that rule the proprietor of the vessel was at liberty to adopt such reasonable rules and regulations for the disposition and comfort of passengers upon his boat, while pursuing its voyage, as seemed to him most for the interest of all concerned. The statute took away from him this power so long as he was within Louisiana. We especially distinguished the case from *Munn* v. *Illinois*, *Peik* v. *Railway Co.*, and the cognate cases, as belonging to a different category, and governed by different considerations; and the difference between them seems to us very apparent.

The Chief Justice, in delivering the opinion of the court, said: "There can be no doubt but that exclusive power has been conferred upon Congress in respect to the regulation of commerce among the several States. The difficulty has never been as to the existence of this power, but as to what is to be deemed an encroachment upon it; for, as has been often said, 'legislation may in a great variety of ways affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution.' *Sherlock* v. *Alling*, 93 U. S. 103; *State Tax on Railway Gross Receipts*, 15 Wall. 284. Thus, in *Munn* v. *Illinois*, 94 U. S. 113, it was decided that a State might regulate the charges of public warehouses, and, in *Chicago, Burlington & Quincy Railroad* v. *Iowa*, 94 U. S. 155, of railroads situate entirely within the State, even though those engaged in commerce among the States might sometimes use the warehouses or the railroads in the prosecution of their business." After referring to the cases of dams and bridges over navigable waters, and of turnpikes and ferries, the

Chief Justice continued : " By such statutes the States regulate, as a matter of domestic concern, the instruments of commerce situated wholly within their own jurisdictions, and over which . they have exclusive governmental control, except when employed in foreign or interstate commerce.   As they can only be used in the State, their regulation for all  purposes may properly be assumed by the State, until Congress acts in reference to their foreign or interstate relations.   When Congress does act, the State laws are superseded only to the extent that they affect commerce outside the State as it comes within the State."   He then added : " But we think it may safely be said that State legislation which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position.   It does not act upon the business through the , local instruments to be employed after coming within the State, but directly upon the business as it comes into the State from without, or goes out from within."   The distinction here taken seems to us sound, and to distinguish the present case from that of De Cuir.   In the Peik case, and others of like character, the State regulated the charges made upon an instrument of commerce (a railroad) situated within the State and under its jurisdiction—such charges being made by virtue of the State's authority ; in the De Cuir case it attempted, as the law operated, to regulate the manner of carrying passengers on an instrument of commerce having no fixed location, but plying on navigable waters within and without the State ; in other words, it attempted to regulate interstate commerce itself, directly, in a matter in which it had no special prerogative to legislate.

Other cases are referred to by the plaintiffs in error in support of their contention ; but we think that no case can be found which is not clearly distinguishable from the present on some or one of the grounds already referred to.

The inconveniences which it has been supposed in argument would follow from the execution of the laws of Illinois, we think have been greatly exaggerated.   But if it should be found to present any real difficulty in the modes of transacting

business on through lines, it is always in the power of Congress to make such reasonable regulations as the interests of inter-state commerce may demand, without denuding the States of their just powers over their own roads and their own corporations.