## WHITTEMORE v. WESTERN UNION TEL. CO.

(Circuit Court, D. Kansas, First Division. December 21, 1895.)

### No. 7,236.

1. TELEGRAPH COMPANY—DELIVERY OF MESSAGE—LIABILITY FOR DELAY.
   When the agent of the company at the terminal office, instead of complying with a rule of the company by demanding payment or guaranty from the sender of charges for delivery beyond the established free-delivery limits, decides to have the message delivered, and trusts to voluntary compensation by the addressee, he is bound to act without unnecessary delay, and deliver it with reasonable promptness.

2. SAME—PAYMENT IN ADVANCE.
   If the sender knew that the addressee lived beyond the free-delivery limits, and he made no deposit to pay for the delivery of the message, and did not guaranty its payment, or provide for such extra service, the failure of the company to deliver the message beyond such limits does not render it liable, unless the operator at the terminal office waived the requirements of prepayment or guaranty, and undertook to deliver the message and trust to the addressee for payment.

Action by Charles E. Whittemore against the Western Union Telegraph Company.

David Overmeyer and J. G. Waters, for plaintiff.

Charles Blood Smith and Clifford Histed, for defendant.

FOSTER, District Judge (charging jury). The plaintiff, Charles E. Whittemore, demands damages from the Western Union Telegraph Company, resulting, as he says, from a failure of the defendant company to deliver to him, with reasonable promptness, a telegram sent by J. J. Squier by previous arrangement between the sender and the plaintiff, dated December 1, 1893, advising the plaintiff to ship his cattle to the Kansas City market as soon as possible, The telegram reads as follows:

"December 1, 1893.

"C. E. Whittemore, Melvern, Kansas: Irwin and I think now a good time to ship as soon as possible. Operator deliver. J. J. Squier."

The plaintiff resided about three miles from Melvern, where the telegram was received. It arrived at about 3:40 o'clock p. m. of the day it was sent, and was delivered to the plaintiff at about 8 o'clock the next morning. The plaintiff maintains that, if it had been delivered with reasonable promptness that afternoon, he could have shipped his cattle the same night, and have reached the Kansas City market the next morning, and could have realized about 50 cents more per 100 lbs. for his cattle than he did some days afterwards. The defendant avers that, as the plaintiff lived beyond the limits of free delivery, the company was not bound to deliver the message until it was paid or secured for such special delivery, and, further, that the message was received by the plaintiff within a reasonable time, and that the plaintiff has sustained no damages, etc. That is the defense of the company. The company has the following limitation or stipulation printed on the blank on which this telegram was written:

"Messages will be delivered free within the established free-delivery limits of the terminal office. If delivered at a greater distance, a special charge will be made to cover the cost of such delivery."

It is very clearly implied, if not expressly agreed, by this provision, that the company does undertake to deliver dispatches beyond the free-delivery limits when the expense of such special delivery is paid or provided for; and it appears from the evidence of the defendant's operator at Melvern that when a special delivery is required, if the expense is not prepaid or provided for, it is a rule of the company that the receiving operator shall wire to the sending office for payment or guaranty of such expense. That was not done in this case, but the company's agent undertook to have the message delivered, as he says, merely as an accommodation to the plaintiff, and without any expectation or requirement of compensation therefor, saving such as the plaintiff might voluntarily pay the messenger, who was not an employé of the defendant company. The plaintiff testifies that he instructed the agent to deliver the expected message when it arrived, and that the agent tacitly agreed to do so; but this the agent positively denies, and says that sometimes the plaintiff had told him not to send out telegrams, but that he would call for them. So it is fair to presume that there was no

general custom or general instructions to the agent by the plaintiff in regard to the matter, and the plaintiff does not make it appear by a preponderance of the evidence that there was any special instruction or agreement between them in this particular instance. Doubtless, the agent, under the circumstances, should have followed the rule of his company, and demanded payment or guaranty of the charges from the sender; but having failed to do so, and deciding to have the message delivered and trust to the voluntary compensation by the plaintiff, he was bound to act without unnecessary delay, and deliver it with reasonable promptness. Whether he did so deliver it is a question for you to determine, under the circumstances; and in deciding that question you must examine the situation as developed by the testimony, the hour when the message was received and delivered, and any other matters bearing on that question. It seems that the operator at Melvern was also agent of the Atchison, Topeka & Santa Fé Railroad Company at that place, had the railroad business to look after, and was kept more or less confined to his office. There was no messenger to deliver messages, but in that small town the agent usually delivered them himself, within the free-delivery limits, and usually employed a liveryman or expressman to carry the outside messages. These facts were presumably known to the plaintiff in this case. Of course, under such circumstances, some time might reasonably elapse before the agent could get a messenger on the road with the telegram. He says that he gave it to the messenger at about 7 o'clock that evening, with the understanding that it should be delivered the next morning. Now, under all the circumstances of the case, you are to decide, gentlemen of the jury, whether that was using reasonable dispatch in sending the telegram to the plaintiff, or whether the agent was guilty of negligence or carelessness in that regard. If you find that he acted with reasonable promptness in the matter, then that is the end of this case, and you must find for the defendant. If, however, you find that the defendant was guilty of negligence, or failed to exercise reasonable care and diligence, in sending the telegram out to the plaintiff, then you will find it necessary to consider another question, and that is this: If the telegram had been delivered within a reasonable time, could or would the plaintiff have shipped his cattle by that night's train? Would he have had time to get them to the station and load them, and were there sufficient cars to be had that night to load them in? These questions you must consider and determine in the light of the evidence in the case. If you should find that he could not have shipped them that night, either for want of time or for want of cars, then he was not damaged by failure to get the telegram, and you will find for the defendant; but if you find that he could and would have shipped them, and that he failed to do so because the telegram was not delivered in proper time, then the plaintiff is entitled to recover, and you will ascertain what damages he has sustained, and give him a verdict therefor. His measure of damages would be the difference in price of such cattle on the Kansas City market on Saturday, De-

cember 2d, and Monday, December 4th. The testimony tends to show that the difference was about 50 cents per 100 pounds; and he claims that he had 182 head of cattle, of about 1,400 pounds each. He would also be entitled to interest at the rate of 6 per cent. per annum to the date of bringing this suit, August 20th last.

The defendant has asked some special instructions, which I will give, although I have probably covered the ground already.

"If the jury find that J. J. Squier, at the time he sent the message to the plaintiff which is in controversy in this action, knew that the plaintiff, to whom it was addressed, lived three or four miles outside of Melvern, and beyond the free-delivery limits of said office, and made no deposit to pay for delivery of the same beyond said free-delivery limits, and did not guaranty the payment of, or make provision for, such extra service, the company was not bound to deliver said message beyond its free-delivery limits at Melvern, and its failure to do so did not render it liable to the plaintiff in this action."

To which I add this: Unless you should find that the operator at Melvern had waived this requirement, and undertaken to deliver the message as before stated.

"The defendant company was only required to exercise ordinary care and diligence in the delivery of the message from Squier to plaintiff, and if the jury find from the evidence that by reason of the distance which the plaintiff resided from Melvern, the hour at which the message was received, and the duties which the operator at Melvern had to perform, both by reason of his connection with defendant and the Atchison, Topeka & Santa Fé Railroad Company, he exercised ordinary care and diligence in the delivery of said message, then and in that event the company is not liable in this action, and your verdict should be in its favor."

Verdict for plaintiff, $721.14.