THE STATE OF INDIANA, EX REL. RAILROAD COMMISSION OF INDIANA, *v*. ADAMS EXPRESS COMPANY.

SAME *v*. AMERICAN EXPRESS COMPANY.

SAME *v*. UNITED STATES EXPRESS COMPANY.

[Nos. 21,173, 21,174, 21,175. Filed June 23, 1908. Rehearing denied October 30, 1908.]

1. PLEADING. — *Complaint.* — *Sufficiency.*—*Mandamus.*—*Alternative Writ.*—A demurrer to the petition and alternative writ in a mandamus case should be sustained, where the command of the alternative writ exceeds the duty of defendant as disclosed by the allegations of such petition and writ. p. 140.

2. CARRIERS.—*Express.*—*Delivery.*—*State Legislation.*—In the absence of any federal legislation the states may require express companies, under a penalty, to perform the common-law duty of making personal delivery of express matter. p. 141.

3. STATUTES.—*Amendments.*—*Effect.*—As to subsequent events, an amendment to a statute is considered as a part of the original act. p. 141.

4. CARRIERS.—*Express Companies.*—*Statutes.*—Under the railroad rate act (34 Stat. 584, U. S. Comp. Stat. Supp. 1907, p. 892 *et seq.*) express companies are common carriers. p. 141.

5. COMMERCE.—*Interstate.*—*Express Companies.*—*Reasonable Preferences.*—What constitutes an unreasonable preference under the railroad rate act (34 Stat. 584, U. S. Comp. Stat. Supp. 1907, p. 892 *et seq.*) is a question of fact, but rates should be relatively equal

so as not to give places of like character unequal advantages, or build up one section at the expense of another. p. 143.

6. COMMERCE.—*Interstate.—Termination of.—Delivery.*—An interstate shipment ends upon the actual delivery thereof to the consignee. p. 144.

7. SAME. — *Interstate. — Statutes.—State Laws.—Suspension.—Express Companies.*—The passage of the railroad rate law (34 Stat. 584, U. S. Comp. Stat. Supp. 1907, p. 892 *et seq.*) had the effect of suspending all state legislation affecting interstate commerce carried on by express companies, including the free delivery act of 1901 (Acts 1901, p. 97, §3912 Burns 1908). p. 144.

8. SAME.—*Regulation of.—Express Companies.—Free Delivery.*— The statute of 1901 (Acts 1901, p. 97, §3912 Burns 1908), compelling express companies to make free delivery in certain territory, constitutes a regulation of interstate commerce within the meaning of the federal Constitution. pp. 148, 153.

9. SAME.—*Express Companies.—Free Delivery.—Interstate Commerce Commission.*—Complaints against express companies which refuse to furnish free delivery of interstate shipments must be made to the interstate commerce commission. p. 151.

10. CARRIERS.—*Express Companies.—Delivery.—Common-Law Duty.*—It is the common-law duty of express companies to make personal delivery of shipments, except at small stations, but they have the right to modify such duty by contract or custom, and to fix reasonable delivery limits. p. 151.

11. STATUTES.—*Federal.—Whether Foreign to States.*—Federal statutes are not foreign to the several states, but must be enforced as of superior dignity to state statutes. p. 154.

From Superior Court of Marion County (71,989, 71,992, 71,995); *Vinson Carter*, Judge.

Actions by The State of Indiana, on the relation of the Railroad Commission of Indiana, against Adams Express Company, American Express Company and United States Express Company. From judgments for defendants, the plaintiff appeals. *Affirmed.*

*James Bingham,* Attorney-General, *Merrill Moores, Walter Myers* and *John Ogden,* for appellant.

*Baker & Daniels,* for appellees.

GILLETT, C. J.—These appeals involve a single question, and will therefore be disposed of together. The State of Indiana, on the relation of the Railroad Commission of In-

diana, has appealed in each of said cases from a judgment which followed the sustaining of a demurrer to the relator's petition and the alternative writ which issued thereon. Omitting the distinctive part of the name of the defendant express company, the command of each writ was as follows: "Now, therefore, you, the ............ Express Company, are hereby ordered and commanded to deliver free of any delivery charge, in all cities within the State of Indiana, having a population of 2,500 or more inhabitants, according to the United States census of 1900, in which you, the ............ Express Company, are engaged in the express business, and where you maintain an office for the transaction of such business, all express matter handled by you, consigned to persons living in any and all such cities, at the proper residence, place of business, or other address of the consignee in such cities, according to the address furnished by the consignor of such express matter, or, on failure so to do, that you appear" to show cause, etc. The matters complained of relate to the imposing of delivery charges upon express matter delivered beyond certain territorial limits, to the refusal to deliver beyond certain limits, or to the practice of making delivery beyond certain limits by means of a local express company which exacts a delivery charge.

It is the settled practice relative to the law of mandamus, that it is ground of demurrer if the command of the alternative writ exceeds the legal duty of the defendant as

1.    disclosed by the averments of the petition and writ. *State, ex rel.,* v. *John* (1908), 170 Ind. 233, and cases cited. If, therefore, it was not the duty of the companies in all circumstances to deliver in the cities described, the express matter received by them, free of any delivery charge, the demurrers were properly sustained.

Relator's counsel almost wholly rely upon the act of March 6, 1901 (Acts 1901, p. 97, §3912 Burns 1908), to support their contention that it is the duty of express com-

panies to make free delivery of express matter in said cities; but attention is called to the fact that, according to the common law, it was the intendment of a general undertaking upon the part of such company that it would make personal, as distinguished from warehouse, delivery.

We held in *United States Express Co.* v. *State* (1905), 164 Ind. 196, that an express company, which refused to make delivery of express matter at the residence of the consignee, in a city of more than 2,500 inhabitants, in accordance with its implied undertaking based on the receipt of a package so addressed, was liable to the penalty of said statute. It was pointed out in that case that there was no federal enactment relative to the interstate shipment of goods by express, and we expressed our conclusion, so far as concerned the objection that the statute was invalid as an attempted regulation of interstate commerce, that it was competent for the State, under a penalty, to require such carriers to live up to their legal duties.

Since the decision of said case, congress has amended and supplemented the several acts known as the interstate commerce act by the enactment of what is termed the railroad rate act. 34 Stat. p. 584, U. S. Comp. Stat. Supp. 1907, p. 892 *et seq.* It is well settled that amendatory sections like those of the latter act are to be treated, as to matters occurring after the enactment of the statute, as if said sections had been in the original act. *Walsh* v. *State, ex rel.* (1895), 142 Ind. 357, 33 L. R. A. 392; *Pomeroy* v. *Beach* (1898), 149 Ind. 511; *Parks* v. *State* (1902), 159 Ind. 211, 59 L. R. A. 190; *Given* v. *State* (1903), 160 Ind. 552. In section one of the railroad rate act it is provided that "the term 'common carrier' as used in this act shall include express companies."

As the command of the alternative writs in the cases before us, to deliver free of any delivery charge, is broad enough to include interstate shipments, the question arises whether congress has not so far legislated upon the subject-

matter as to forbid interference therewith on the part of the State, either by its legislative department, or by its judicial writs.

In the section referred to it is provided that the term *"transportation"* shall include, among other things, "all services in connection with the receipt, *delivery,* elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported." It is further provided in said section that "all charges made for any service rendered or to be rendered in the *transportation* of passengers or property as aforesaid, *or in connection therewith,* shall be just and reasonable ; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful." Section two of said act requires that the schedules, which the common carrier is required to file with the commission, and to keep open to public inspection, shall show "all the rates, fares, and charges for transportation between different points on its own route." It is further provided by said section that the schedules "shall plainly state the *places* between which *property* and passengers will be carried, * * * and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, *all privileges or facilities granted or allowed and any rules or regulations which in anywise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee."* Said section also makes it unlawful to charge, demand, collect or receive a greater or less or different compensation "for such transportation of passengers or property, *or for any service in connection therewith,* between the points named in such tariffs," than the schedule rates, fares and charges. In the fourth section of said act the commission is authorized and empowered, upon complaint, if "it shall be of the opinion that

any of the rates, or charges whatsoever, demanded, charged, or collected by any common carrier or carriers, subject to the provisions of this act, for the *transportation* of persons or property as defined in the first section of this act, *or that any regulations or practices whatsoever of such carrier or carriers affecting such rates,* are unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this act, to determine and prescribe what will be the just and reasonable rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged; *and what regulation or practice in respect to such transportation is just, fair, and reasonable to be thereafter followed;* and to make an order that the carrier shall cease and desist from such violation, to the extent to which the commission find the same to exist, and shall not thereafter publish, demand, or collect any rate or charge for such transportation in excess of the maximum rate or charge so prescribed, *and shall conform to the regulation or practice so prescribed.*"
(The italics are ours.) Provision is made in this section for the suspension of the order, but this does not concern us. The third section of the original act has not been amended. It prohibits the giving of any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality. What is an undue or unreasonable preference or advantage is a question of fact, but, subject to militating circumstances, it may be said that under said section rates ought to be relatively equal and reasonable, and that the carrier has no right to make rates so as to overcome the natural advantage of one place over another, or so as to build up one place or section at the expense of another. See authorities cited in 17 Am. and Eng. Ency. Law (2d ed.), 143, 144.

There can be no doubt that where an interstate shipment of goods is made, wherein it is the contemplation that,

through the agency of a common carrier, delivery
6. shall be made to the consignee, instead of being de-
livered, at a warehouse, the goods continue a subject
of interstate commerce until they are delivered to the con-
signee. This has, in effect, been decided by the cases wherein
it is determined when intoxicating liquors shipped into a
state become, under the Wilson law, subject to the police
power thereof. *Rhodes* v. *Iowa* (1898), 170 U. S. 412, 18
Sup. Ct. 664, 42 L. Ed. 1088; *Adams Express Co.* v. *Ken-
tucky* (1907), 206 U. S. 129, 27 Sup. Ct. 606, 51 L. Ed. 987.

It is equally clear, in our opinion, that the interstate com-
merce act and the railroad rate law occupy the whole field,
so far as any question is here raised concerning the
7. transaction of interstate commerce by express com-
panies. As we have shown, according to the latter
act, the term "transportation" includes the delivery and
handling of property transported, and this provision takes
on a broader significance as applied to express companies
than it does when applied to railroad companies, since the
latter are expected to make only warehouse delivery. See
*United States Express Co.* v. *State, supra.* It therefore ap-
pears that, for the purpose of controlling the transaction of
the business of interstate commerce by express companies,
there has been an assumption of jurisdiction by congress
over the subject-matter of such shipments down to the point
where the transit is entirely at an end.

It is held in *Interstate Commerce Com.* v. *Detroit, etc.,
R. Co.* (1897), 167 U. S. 633, 17 Sup. Ct. 986, 42 L. Ed. 306,
that a railway company did not violate what is termed the
"long- and short-haul clause" of the interstate commerce act
by furnishing free cartage in order to secure traffic which
would otherwise go by other lines. Doubt was expressed
whether the failure to publish the fact of such privilege was
a violation of the original schedule clause. The holding re-
ferred to was based on the fact that, as between a common
carrier by railroad and its shipper, the transportation ends

when the freight is received at the warehouse, and that the charge is made for a service which ends there. As to the doubt suggested, it may be said that the schedule clause has been very materially strengthened by the railroad rate act. In connection with the intimation referred to, the court said: "However, in a matter of this kind, much should be left to the judgment of the commission, and should it direct, by a general order, that railway companies should thereafter regard cartage when furnished free as one of the terminal charges, and include it as such in their schedules, such an order might be regarded as a reasonable exercise of the commission's powers."

Counsel for relator, insisting that the requirement of the Indiana statute means unconditional or free delivery, irrespective of contract, argue that the statute does not amount to a regulation of interstate commerce. We may readily concede, in respect to the local delivery of interstate shipments of goods, that a police regulation which does no more than to require a common carrier, under a penalty, to live up to its obligations, is not one of such general concern that the silence of congress amounts to a declaration that such commerce shall be free, but the difficulty which relator encounters grows out of the fact that since the enactment of the Indiana statute congress has assumed jurisdiction over interstate traffic by express down to the point of delivery, and, as we think, has provided for a manner of regulating such commerce which is inconsistent with the operation of the statute, construed as relator's counsel contend that it should be.

As the federal law now stands, a common carrier by express is not only under a duty to make its charges just and reasonable in respect to any service in connection with the transportation, and to avoid unjust and unreasonable preferences as to localities, but it is required to schedule and report all privileges or facilities granted, and all rules or regulations which affect the value of such rates or charges or the

value of the service rendered to the shipper or to the consignee. It is also required to observe its schedules in the fixing of its charges, and is liable to have its maximum rates lowered if excessive, as well as to have its regulations or practices changed so as to make them just, fair and reasonable in respect to such transportation. So far as we can perceive, the whole question whether the practice or regulation complained of is objectionable is absolutely interlocked with the general•spirit of the act, and must necessarily be left with the tribunal which is charged with the duty of carrying out its provisions.

In principle the case of *Gulf, etc., R. Co.* v. *Hefley* (1895), 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910, is exactly in point. In that case it was held that a state statute requiring the delivery of freight on payment of the rates specified in the bill of lading was inoperative as against an interstate shipment, where the bill of lading had been issued by another railroad company at a rate less than the joint tariff rate of such companies. Mr. Justice Brewer, speaking for the court, said: "Clearly the state and the national acts relate to the same subject-matter and prescribe different rules. By the state act the bill of lading is made controlling as to the rate collectible, and a failure to comply with that requirement exposes the delinquent carrier to its penalties, while the national statute ignores the bill of lading and makes the published tariff rate binding, and subjects the offender, both carrier and agent, to severe penalties. The carrier cannot obey one statute without sometimes exposing itself to the penalties prescribed by the other.  *  *  *  In case of such a conflict the state law must yield.  *  *  *  The question is not whether, in any particular case, operation may be given to both statutes, but whether their enforcement may expose a party to a conflict of duties. It is enough that the two statutes operating upon the same subject-matter prescribe different rules. . In such case, one must yield, and that one is the state law. It may be conceded that were there

no congressional legislation in respect to the matter, the state act could be held applicable to interstate shipments as a police regulation. *Chicago, etc., R. Co.* v. *Fuller* [1873], 17 Wall. 560, 21 L. Ed. 710. In that case a statute of Iowa, requiring each railroad company annually in the month of September to establish passenger and freight rates, and on the first day of October following put up at all the stations on its route a printed copy of such rates and cause it to remain posted during the year, and, providing that, for charging and receiving higher rates than thus posted it should forfeit not less than $100 nor more than $200 to any person injured thereby, was upheld, notwithstanding congress had passed the act of June 15, 1866, c. 124, 14 Stat. 66, providing 'that every railroad company in the United States * * * be and is hereby authorized to carry upon and over its road * * * all passengers * * * freight and property on their way from any state to another state, and to receive compensation therefor;' and a recovery in favor of a party having shipped freight from Illinois into Iowa and charged higher rates of freight than thus posted was sustained. It will be perceived that the two statutes do not conflict, do not prescribe different rules, and only in a very general sense can be said to be in relation to the same subject-matter. It was held that the state statute was simply a police regulation. While so holding, it was also said that even if it did affect commerce the question would arise whether it did not fall within that class of cases of which several were noticed in the opinion, where an act conceded to be a regulation of interstate commerce, yet local in its character, had been sustained by reason of the absence of congressional legislation in respect thereto. * * * It is unnecessary to pursue this discussion further. The state statute and the national law operate upon the same subject-matter, and prescribe different rules concerning it. The national law is unquestionably one within the competency of congress to enact under the power given to regulate com-

merce between the states.    The state statute must, therefore, give way.''

. In *Texas, etc., R. Co.* v. *Mugg* (1906), 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011, it was held that under the case of *Gulf, etc., R. Co.* v. *Hefley, supra,* a railroad company was not liable in damages for exacting, upon an interstate shipment, the rates specified in its schedule, although the company had quoted to the plaintiffs a lower rate, and they had made sales on the strength thereof.    The court pointed out that the clear effect of said decision was to declare that, whatever may have been the rate agreed upon, the carrier's lien upon the goods was, by force of the act of congress, for the amount fixed by the published schedule of rates and charges.

But, aside from the general objection already pointed out, the effect of a requirement of free local delivery would be to make it necessary to adjust the interstate rate with reference to the fact that a local burden has been imposed on the business.    It also appears to us that the mandate sought is open to the objection that it would preclude the imposition of a delivery charge where, by contract in another state, it is provided that the transportation charges shall be paid by the consignee, and also where, by such contract, it is expressly agreed that the delivery shall be made on payment of the general transportation charges plus a delivery fee.    All portions of the transit involve expense to the carrier, and he can only charge reasonable rates therefor.    Some idea of the importance of the factor of terminal expenses may be gathered from the fact that in *Kindel* v. *Adams Express Co.* (1908), 13 Interstate Com. Rep. 475, 495, the commission states that it fairly appears from the evidence in that case that the terminal expenses of the company aggregate about twenty-five per cent of the entire operating expenses of all kinds, including transportation. If the carrier cannot exact a delivery charge, or, what would be to accomplish the same thing by indirection, cover it in its

general charges, it necessarily follows that the local transportation must be free, and that the expense therefor must be treated as a factor in and a charge upon its general business. As was said in *In the Matter of Exchange of Free Transportation* (1907), 12 Interstate Com. Rep. 39, 44; "It must be borne in mind that every extension of the privilege of free transportation casts an appreciable additional burden upon those who pay for their transportation and thus contribute to the earnings that carriers are entitled to as a just return upon the capital invested. The whole spirit of the act is that this burden should be distributed as equally and equitably as possible."

In *Wabash, etc., R. Co. v. Illinois* (1886), 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244, which was decided before the enactment of the interstate commerce law, it was held that that part of the continuous transportation of goods, shipped from one state to another, which was within the state where the shipment was made, was interstate commerce, and that, as a consequence, a statute of the state where the shipment originated forbidding discrimination in charges was invalid as applied to such a shipment. In that case (at page 573) the court, referring to the commerce clause of the United States Constitution, said: "And it would be a very feeble and almost useless provision, but poorly adapted to secure the entire freedom of commerce among the states which was deemed essential to a more perfect union by the framers of the Constitution, if, at every stage of the transportation of goods and chattels through the country, the state within whose limits a part of this transportation must be done could impose regulations concerning the price, compensation, or taxation, or any other restrictive regulation interfering with and seriously embarrassing this commerce." After considering a number of its earlier decisions, the court said: "We must, therefore, hold that it is not, and never has been, the deliberate opinion of a majority of this court that a statute of a state which attempts to regulate the fares and charges

by railroad companies within its limits, for a transportation which constitutes a part of commerce among the states, is a valid law.'' After pointing out the manner in which the regulation in question in that case would operate to circumscribe the power of the carrier in fixing rates, in order to avoid discrimination, the court, in conclusion, said: ''Of the justice or propriety of the principle which' lies at the foundation of the Illinois statute it is not the province of this court to speak. As restricted to a transportation which begins and ends within the limits of the state it may be very just and equitable, and it certainly is the province of the state legislature to determine that question. But when it is attempted to apply to transportation through an entire series of states a principle of this kind, and each one of the states shall attempt to establish its own rates of transportation, its own methods to prevent discrimination in rates, or to permit it, the deleterious influence upon the freedom of commerce among the states and upon the transit of goods through those states cannot be overestimated. That this species of regulation is one which must be, if established at all, of a general and national character, and cannot be, safely and wisely remitted to local rules and local regulations, we think is clear from what has already been said. And if it be a regulation of commerce, as we think we have demonstrated it is, and as the Illinois court conceded it to be, it must be of that national character, and the regulation can only appropriately exist by general rules and principles, which demand that it should be done by the congress of the United States under the commerce clause of the Constitution.''

In *Louisville, etc., R. Co.* v. *Eubank* (1902), 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416, the court, after pointing out the manner in which the statute there under consideration might injuriously affect interstate commerce, added: ''Other cases may be supposed, where the effect might not be so oppressive. But the fact which vitiates the provision is that

it compels the carrier to regulate, adjust or fix his entire interstate rates with some reference at least to his rates within the state, thus enabling the state by constitutional provision or by legislation directly to affect, and in that way to regulate, to some extent the interstate commerce of the carrier, which power of regulation the Constitution of the United States gives to the federal congress.''

It is our conclusion that the court did not err in sustaining the demurrers to the petitions and alternative writs.

We may further say that it appears to us that if the conduct of the express companies, in respect to interstate commerce, is objectionable, by reason of a failure to pursue the course demanded of them by the alternative writs, complaint should be made to the interstate commerce commission, and not to the courts.

The judgments are affirmed.

## ON PETITION FOR REHEARING.

GILLETT, C. J.—In their brief on petition for rehearing counsel for relator state that it is the common-law duty of express companies to make personal delivery, except at small stations, and that the Indiana statute is declaratory of the common law as applied to cities of 2,500 or more inhabitants, and it is insisted that the federal enactment was not designed to add to or take from the common-law duties of such carriers.

It is true that the courts have treated common carriers by express as analogous to common carriers by wagon, and, with the exception heretofore mentioned, have held that it is an implication of their undertaking that they will make personal delivery. The authorities, however, seem to rest on the theory that this responsibility springs from the nature of the undertaking where .otherwise unrestricted. Judge Redfield refers to the duties of such carriers to make personal delivery as the *prima facie* rule (Redfield, Carriers, §58),

and the doctrine is so stated by Cowen, J., in *Gibson* v. *Culver* (1837), 17 Wend. 305, 31 Am. Dec. 297. Judge Story says: "If there is any special contract between the parties, or any local custom or usage of trade on the subject, that will govern; the former as an express, and the latter as an implied term in the contract." Story, Bailments (9th ed.), §543. Angell, Carriers (4th ed.), §295, lays down the rule that "when the carriage is by land, and in the absence of any established usage, or any special contract to the contrary, the goods must be carried to the residence of the consignee." It is stated by a modern text-writer that "in all cases where a special contract or usage is shown to exist which relieves the carrier from personal delivery, unless the provisions of the contract are unreasonable, the carrier is not liable if delivery be made in accordance with such special contract or usage." Moore, Carriers, 194. See, also, *American Express Co.* v. *Hockett* (1868), 30 Ind. 250, 95 Am. Dec. 691; *President, etc.,* v. *American Express Co.* (1864), 8 Allen 512; 2 Parsons, Contracts (9th ed), *186, *187. The case of *Bullard* v. *American Express Co.* (1895), 107 Mich. 695, 65 N. W. 551, 61 Am. St. 358, 33 L. R. A. 66, goes still further. It is there held that it is competent for a carrier by express to establish reasonable delivery limits within a city as against persons having knowledge of the regulation. The court said: "It is clear that a reasonable limit is not in all cases the city limit. Conditions are often varied. If not the city limit, can it be said that a certain number of miles from the office, in either direction, would be a reasonable limit? We think, where the company, in apparent good faith, has assumed to fix limits, having regard to the public requirements, that, with regard to persons who have dealt with it, having knowledge of this fact, it is not bound to deliver beyond these limits."

An analogous principle has been recognized as to common carriers by telegraph, for although, *prima facie,* their under-

taking is to deliver to the addressee or his authorized agent, yet their right has been recognized to fix reasonable delivery limits within a town or city and to impose a reasonable charge for deliveries beyond such limits. *Whittemore* v. *Western Union Tel. Co.* (1895), 71 Fed. 651; *Western Union Tel. Co.* v. *Henderson* (1889), 89 Ala. 510, 7 South. 418, 18 Am. St. 148; *Western Union Tel. Co.* v. *Trotter* (1894), 55 Ill. App. 659; *Reynolds* v. *Western Union Tel. Co.* (1899), 81 Mo. App. 223; Jones, Telegraph and Telephone Companies, §296.

Apart from the matters heretofore referred to, we have no doubt of the common-law right of carriers by express reasonably to fix their tolls with reference to the extent of the service to be rendered.

In view of the considerations before stated, it certainly cannot be said that the Indiana statute is merely in aid of the common law. On the contrary, if the statute is to be construed as relator's counsel must necessarily contend, express companies are, as it were, put into a straight-jacket, being denied the right, by contract or by reasonable regulation, to limit their duty in respect to delivery, and being also denied the right to equalize their tolls by the making of fair charges for delivery beyond certain limits.

Whatever may be said of the statute, if thus construed, as applied to intrastate shipments, it certainly cannot be said that, as applied to interstate shipments, it is not a regulation of commerce, much less that it could not come in conflict with the power of regulation which has been imposed in the interstate commerce commission.

It might be that the very practices complained of would commend themselves to the commission as just and reasonable, and that, if it were found that the companies were casting upon their other traffic the expense of long and burdensome free deliveries, an order would be made forbidding

State, ex rel., *v.* Adams Express Co.—171 Ind. 138.

the same and substituting a reasonable regulation or practice designed to give greater equality, in view of all the circumstances, among the patrons of such companies. This very consideration must, in view of the railway rate act, operate to suspend the state statute, if construed as appellant contends that it should be, as to interstate shipments by express, and, besides, as we pointed out in the principal opinion, under the authority of the Supreme Court of the United States, any state enactment which imposes a local burden of transportation, which in its operation would require the carrier to adjust his interstate rate with reference thereto, amounts to an attempted regulation of interstate commerce, and is therefore void as to such transactions.

In their brief on petition for rehearing counsel for relator say: ''The opinion handed down in this case is based wholly on the construction by this court of a federal statute which has not been construed by the federal courts, the final arbiters as to such matters. This court has held as a result, of such construction of the law of a foreign jurisdiction that the Indiana statute previously sustained is not effective.'' This extract abounds in errors. (1) Our holding is not based solely on the construction of a federal statute, since, in the absence of such a statute, the act, as applied to interstate shipments would, upon the construction contended for, amount to an attempted regulation of interstate commerce within the holding of *Louisville, etc., R. Co.* v. *Eubank* (1902), 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416. (2) The Indiana statute has not been sustained by this court as applied to a case which is within the principle of this one. (3) The statutes of the United States are not, as to this court, the law of a foreign jurisdiction. On the contrary, we find it provided in the Constitution of the United States that ''this Constitution, and the laws of the United States which shall be made in pursuance thereof, * * * shall be the supreme law of the land; and the judges in every state shall be bound thereby, any-

thing in the constitution or laws of any state to the contrary notwithstanding.'' Art. 6.

There is no ground for a rehearing, and the petition is therefore overruled.